No. 81,135

STATE OF KANSAS, *Appellee*, v. MICHAEL LEE MARSH II,
*Appellant*.

(102 P.3d 445)

Opinion filed December 17, 2004.

*Rebecca E. Woodman* and *Steven R. Zinn*, capital appellate defenders, argued the cause and were on the briefs for appellant.

*John K. Bork*, assistant attorney general, argued the cause, and *Kristafer Ailslieger, Jared Maag*, and *Elizabeth Reimer*, assistant attorneys general, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, LUCKERT, GERNON, and BEIER, JJ.: This is an appeal by the defendant, Michael L. Marsh II, from convictions of capital murder of Marry Elizabeth Pusch (M.P.), first-degree premeditated murder of Marry Ane Pusch (Marry), aggravated arson, and aggravated burglary. Marsh has been sentenced to death for the capital offense, life imprisonment with a mandatory minimum term of 40 years for the murder of Marry, 51 months for aggravated arson, and 34 months for aggravated burglary. The district court ordered the last three sentences to be served consecutively.

On appeal, Marsh raises 18 issues arising from the guilt phase of the trial and 16 issues from the penalty phase. We begin by observing that there is a heightened scrutiny of trial proceedings in a capital case. *Beck v. Alabama*, 447 U.S. 625, 637-38, 65 L. Ed. 2d 392, 100 S. Ct. 2382 (1980). However, because we conclude K.S.A. 21-4624(e) is unconstitutional on its face, precluding application of the death penalty, we will not apply a heightened scrutiny standard of review to the remaining issues on appeal.

We deem the following issues to be controlling: (1) Is there substantial competent evidence to support each of Marsh's convictions? (2) Was evidence improperly excluded by the district court? (3) Is K.S.A. 21-4624(e) unconstitutional on its face? (4) Is there substantial competent evidence to support imposition of a hard 40 sentence for the premeditated murder of Marry? and, (5) Is the hard 40 sentencing scheme set forth in K.S.A. 2003 Supp. 21-4635(a) unconstitutional?

## FACTS

On the evening of June 17, 1996, Marry and her 19-month-old daughter, M.P., were murdered in their Wichita home. Marry died as a result of multiple gunshot wounds to her head and a knife wound to her heart. The perpetrator or perpetrators apparently did not physically harm M.P before setting the house afire and leaving the child to die in the ensuing conflagration. M.P. sustained severe burns to her body, resulting in multiple organ failure and death on June 23, 1996.

Fire investigators determined the fire was intentionally started with an accelerant applied to Marry's body. An autopsy revealed Marry had been shot 3 times, stabbed in the heart, and her throat slashed. The county coroner concluded Marry had died as a result of her wounds, with her body set afire after death.

In the initial stages of investigation, detectives interviewed Marry's husband, Eric Pusch (Pusch), who mentioned having spent most of June 17 with a friend, Michael Marsh, before going to work at approximately 4:30 p.m. as a delivery man for a local Pizza Hut. This led the police to interview Marsh.

A series of interviews with Marsh resulted in his confession to shooting Marry and abandoning M.P. when he fled the residence. He told the detectives his motive was to obtain money from the Pusch family. According to Marsh, he planned to be in the home when Marry and M.P. arrived, tie them up, and wait until Pusch got home. He would then threaten Pusch with harm to his wife and child to obtain the money needed for a trip to Alaska. Marsh indicated his plan went awry when Marry and M.P. arrived at the house earlier than he had anticipated; he panicked and shot Marry. Initially, he told detectives he could not recall how many times he pulled the trigger; subsequently, he indicated firing the gun once. Marsh was equivocal regarding the fire. At one point he indicated he probably did set the fire; at another point he stated he could not remember; and, finally, he denied setting the fire. Marsh denied Pusch was in any way involved in committing the crimes.

There was substantial evidence corroborating Marsh's confession. Marsh lived with his grandparents. Keys to the Pusch home were found discarded in a yard next to the grandparents' home. Among the items recovered during execution of a search warrant at the grandparents' residence were a .25 caliber pistol with five cartridges in the magazine, Marsh's bloodstained tennis shoes, a pillow with bullet holes in it wrapped in duct tape, and a water bottle with duct tape around its neck. Expert testimony at trial established the pillow and bottle could be used as a makeshift silencer.

Both Marry's and M.P.'s clothing tested positive for medium petroleum vapors consistent with lighter fluid. However, Marsh's

clothing and shoes tested negative for vapors. Marry's blood was found on one of Marsh's tennis shoes; inexplicably, so also was the blood of Pusch.

Prior to trial, the State filed a motion in limine to prevent Marsh from introducing circumstantial evidence suggesting that Pusch stabbed Marry and set the fire killing M.P. The State contended that Kansas law would prevent admission of circumstantial evidence tending to implicate Pusch in the face of direct evidence Marsh killed Marry and set the fire. Marsh's trial counsel argued there was substantial evidence linking Pusch to the crimes and proffered the evidence the defendant sought to introduce at trial. The district court granted the State's motion in limine, reasoning that the State's evidence against Marsh was direct and thus the defense could not present the proffered circumstantial evidence to implicate Pusch.

The jury found Marsh guilty of capital murder of M.P., first-degree murder of Marry, aggravated arson, and aggravated burglary. At the penalty phase of the trial, the State relied upon the following statutory aggravating factors to support a death sentence: (1) Marsh knowingly or purposely killed or created a great risk of death to more than one person; (2) he committed the crime in order to avoid or prevent a lawful arrest or prosecution; and (3) he committed the crime in an especially heinous, atrocious or cruel manner. See K.S.A. 21-4625. The jury found all three aggravating circumstances existed and were not outweighed by any mitigating circumstances and unanimously agreed to a sentence of death.

At sentencing, the trial judge found sufficient evidence to support the sentence of death recommended by the jury. See K.S.A. 21-4624(f). The trial judge also found the same three aggravating circumstances were not outweighed by mitigating circumstances to support imposition of a hard-40 sentence. See K.S.A. 2003 Supp. 21-4638. Marsh also was sentenced to 51 months for aggravated arson and 34 months for aggravated burglary, with all sentences to be served consecutively.

## SUFFICIENCY OF THE EVIDENCE

The issue on appeal is limited to whether the evidence was sufficient to support the jury's verdict finding Marsh guilty of capital

murder. Marsh contends the evidence was insufficient to establish that: (1) he set the fire; (2) M.P.'s burns were the proximate cause of her death; or (3) he intentionally killed M.P. with premeditation. When a sufficiency of the evidence issue is raised, our standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Zabrinas*, 271 Kan. 422, 441-42, 24 P.3d 77 (2001).

Marsh confessed to the crime of aggravated burglary. He admitted hiding in the Pusch home and shooting Marry in the head when she came into the bedroom. The .25 caliber pistol used to shoot Marry was subsequently found in Marsh's backpack at his grandparents' home. He admitted to attempting to start a fire with matches to conceal his crimes but claimed this was unsuccessful. Nonetheless, we know from the uncontroverted evidence there was a fire that caused burns to more than 75 percent of M.P.'s body. Although there is no direct evidence Marsh set the fire, the circumstantial evidence is sufficient for a rational factfinder to conclude beyond a reasonable doubt that he did so and that he abandoned M.P. to die in the fire.

Marsh also argues the evidence was insufficient to establish M.P.'s burns were the proximate cause of her death. This argument must fail. Both the treating physician and the medical coroner testified M.P.'s cause of death resulted from the extensive burns to her body and the related failure of internal organs. Conversely, both doctors concluded the drugs given to M.P. at the hospital did not cause her death.

A conviction of even the gravest offense may be sustained by circumstantial evidence, *State v. Penn*, 271 Kan. 561, 564, 23 P.3d 889 (2001), and it is the function of a jury and not an appellate court to weigh evidence and pass on the credibility of witnesses. *State v. Moore*, 269 Kan. 27, 30, 4 P.3d 1141 (2000). After considering all of the evidence presented to the jury for its consideration upon this issue, we conclude Marsh's sufficiency of the evidence arguments must fail.

## THE EXCLUSION OF MARSH'S EVIDENCE

Marsh contends the district court erred in excluding evidence connecting Pusch to the crimes. Marsh argues the court's pretrial order in limine excluding the evidence was erroneous for two reasons: First, the Kansas third-party evidence rule only excludes motive evidence in the absence of other relevant evidence, circumstantial or direct, to connect a third party to the crime; and second, after Pusch testified as a witness for the State, the "door was opened" and the order in limine should have been disregarded.

" 'The purpose of a motion in limine is to assure all parties a fair and impartial trial by prohibiting inadmissible evidence, prejudicial statements, and improper questions by counsel.' " *State v. Abu-Fakher,* 274 Kan. 584, 594, 56 P.3d 166 (2002) (quoting *Brunett v. Albrecht,* 248 Kan. 634, 638, 810 P.2d 276 [1991]).

A party whose evidence is excluded by a motion in limine has the responsibility of proffering sufficient evidence to preserve the issue on appeal. *State v. Evans,* 275 Kan. 95, 99, 62 P.3d 220 (2003). We observe the State does not challenge the sufficiency of Marsh's proffer to the district court. We conclude the issue has been properly preserved for appeal.

We acknowledge our standard of review to be as stated in *Evans:*

"K.S.A. 60-261 provides that no error in either the admission or the exclusion of evidence is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. *State v. Leitner,* 272 Kan. 398, Syl. ¶ 7, 34 P.3d 42 (2001); *State v. Morris,* 255 Kan. 964, Syl. ¶ 6, 880 P.2d 1244 (1994).

"Errors in violation of a constitutional right of a party are governed by the federal constitutional error rule. *State v. Lyons,* 266 Kan. 591, 598, 973 P.2d 794 (1999). Under the federal constitutional error rule, an error of constitutional magnitude is serious and may not be found harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before the court may declare the error harmless, it must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *Leitner,* 272 Kan. 398, Syl. ¶ 8; *State v. Clark,* 261 Kan. 460, 469, 931 P.2d 664 (1997); *State v. McClanahan,* 259 Kan. 86, Syl. ¶ 4, 910 P.2d 193 (1996).

"This court has previously recognized that under the state and federal Constitutions a defendant is entitled to present the theory of his or her defense and that

the exclusion of evidence that is an *integral* part of that theory violates a de-fendant's fundamental right to a fair trial. *Mays,* 254 Kan. at 486 (quoting *State v. Bradley,* 223 Kan. 710, Syl. ¶ 2, 576 P.2d 647 [1978]); *State v. Gonzales,* 245 Kan. 691, 699, 783 P.2d 1239 (1989). ' "Few rights are more fundamental than that of an accused to present witnesses in his own defense." ' *Gonzales,* 245 Kan. at 699 (quoting *Chambers v. Mississippi,* 410 U.S. 284, 302, 35 L. Ed. 2d 297, 93 S. Ct. 1038 [1973]). The right to present a defense is, however, subject to statutory rules and case law interpretation of rules of evidence and procedure. *State v. Bedford,* 269 Kan. 315, 319, 7 P.3d 224 (2000); *State v. Davis,* 256 Kan. 1, 11, 883 P.2d 735 (1994); *Bradley,* 223 Kan. at 714." *State v. Evans,* 275 Kan. at 102.

With the above standards in place, we turn to the substantive issue: Did the district court err in concluding as a matter of law that circumstantial evidence connecting Pusch to the crimes, as outlined in Marsh's proffer, was irrelevant?

The general rule is that, unless otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are designed to establish. *State v. Lumley,* 266 Kan. 939, 950-51, 976 P.2d 486 (1999). We have also recognized the "probative values of direct and circumstantial evidence are intrinsically similar, and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each." *State v. Scott,* 271 Kan. 103, Syl. ¶ 2, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001).

Under the above rules of evidence, we have said: "Where the State relies on direct rather than on circumstantial evidence for conviction, evidence offered by defendant to indicate a *possible motive* of someone other than the defendant to commit the crime is incompetent *absent some other evidence to connect the third party with the crime."* (Emphasis added.) *State v. Neff,* 169 Kan. 116, Syl. ¶ 7, 218 P.2d 248, *cert. denied* 340 U.S. 866 (1950). We said in *Neff* that evidence of a third person's motive *alone* would not have any tendency to prove a material fact, but instead would serve to "confuse the jury, to permit [jurors] to indulge in speculations on collateral matters wholly devoid of probative value rel-

ative to who committed the [crime] and to divert their attention from the main issue they were sworn to try." 169 Kan. at 123. Thus understood, the so-called third-party evidence rule has limited application and is most assuredly subordinate to the general rules of evidence and the statutory definition of relevancy in K.S.A. 60-401(b).

Our recent decision in *State v. Evans* also helps to clarify the limited application of the rule excluding third-party motive evidence. In *Evans*, the State asserted it would call two eyewitnesses to testify Evans shot the victim. In opposing the State's motion in limine, the defendant proffered the testimony of several witnesses who said they saw a third person, Reed, holding the murder weapon immediately after the shot. Thus there was direct evidence Evans shot the victim, and there was circumstantial evidence Reed shot the victim. The district court excluded the circumstantial evidence under the third-party evidence rule. 275 Kan. at 97-98. We reversed, noting that, in terms of probative value, there was no distinction between direct and circumstantial evidence. 275 Kan. at 105. We further stated:

"The trial court's exclusion of the proffered evidence was inconsistent with substantial justice and infringed upon Evans' substantial rights. The evidence Evans sought to present in this case was more than just that someone other than the defendant may have committed the crime. There was evidence that linked Reed to the commission of the crime—witnesses saw Reed holding the gun immediately after the shot was fired—and evidence that Reed subsequently admitted to shooting [the victim] and dumping his body. Under these circumstances, it was erroneous for the trial court to have excluded Evans from presenting the proffered circumstantial evidence." 275 Kan. at 106.

Both *Neff* and *Evans* clarify that, while evidence of the motive of a third party to commit the crime, standing alone, is not relevant, such evidence may be relevant if there is other evidence connecting the third party to the crime. A corollary rule is that circumstantial evidence connecting a third party to a crime will not be excluded merely because the State relies upon direct evidence of the defendant's guilt. In short, there is no bright line rule. Instead, there must be the sound exercise of judicial discretion dependent on the totality of facts and circumstances in a given case. Here, Marsh did

not merely proffer evidence of Pusch's motive. Rather, he also proffered other evidence of Pusch's connection to the crime. This required the district judge to consider whether the evidence was relevant under K.S.A. 60-407(f), and his failure to do so constitutes error.

We recognize there are decisions of our court arguably suggesting we should apply the third-party evidence rule more broadly. See *State v. Bedford*, 269 Kan. 315, 320, 7 P.3d 224 (2000); *State v. Bornholdt*, 261 Kan. 644, 666, 932 P.2d 964 (1997); *State v. Peckham,.*255 Kan. 310, 321, 875 P.2d 257 (1994); *State v. Calvert*, 211 Kan. 174, 179, 505 P.2d 1110 (1973). To the extent these cases are inconsistent with *Evans*, they are disapproved.

There are additional reasons the district court's refusal to admit the third-party evidence constituted error.

First, even under the State's inflated view of the third-party evidence rule, the rule should not have been applied as to the capital murder and the aggravated arson charges. The State's evidence on those crimes was circumstantial, not direct, because Marsh specifically denied setting the fire leading to M.P.'s death. See *Evans*, 275 Kan. at 105-06.

There also is merit to Marsh's contention that, regardless of the propriety of the district court's order in limine, it erred in failing to admit the proffered evidence after Pusch testified at trial. Marsh argues that Pusch's testimony "opened the door" to evidence connecting Pusch to the crime.

A party, through testimony, may open the door for otherwise inadmissible evidence. *State v. Bedford*, 269 Kan. at 322; *State v. McClanahan*, 259 Kan. 86, 94, 910 P.2d 193 (1996). The admission of circumstantial evidence of a third person's culpability is constitutionally required where that third person is a government witness. 2 Jones on Evidence § 13:38 (1994) (citing the United States Supreme Court's decisions in *Olden v. Kentucky*, 488 U.S. 227, 102 L. Ed. 2d 513, 109 S. Ct. 480 [1988]; and *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 [1974]). In both *Olden* and *Davis*, the Court held a defendant's constitutional right of confrontation was violated upon a showing he was prohibited from engaging in "otherwise appropriate cross-examination designed to

show a prototypical form of bias on the part of the witness." *Olden*, 488 U.S. at 231; *Davis*, 415 U.S. at 318. As has been noted, "[w]hat greater motive could a witness have to lie, than to deflect suspicion from himself or herself?" 2 Jones on Evidence § 13:38.

Evidence that a witness was in fact the person who committed the crime is almost always relevant and should be admissible where the witness testifies against the defendant. However, we did uphold a district court's refusal to allow such evidence in *State v. Bedford*. It is on this case that the State bases its argument that Pusch's testimony did not open the door to evidence of his involvement in the crime.

In *Bedford*, our decision was based upon unique circumstances. Although the estranged husband in *Bedford* testified on behalf of the State, his testimony simply showed that the victim went to a bar on the day of the murder, after which he never saw the victim again. 269 Kan. at 319-321. There was apparently no testimony by him in any way connecting the defendant to the murder and thus little need to question his credibility.

Having concluded the district court erred in entering an order in limine, we turn to the issue of whether the exclusion of the third-party evidence violated Marsh's fundamental right to a fair trial. We will not unduly extend the length of this opinion with an exhaustive review of the evidence proffered by Marsh that tended to connect Pusch to the crime. The fact is the district court misconstrued the third-party evidence rule and did not determine whether the proffered evidence was otherwise admissible under the rules of evidence. Clearly, much of the evidence sought to be introduced demonstrated more than mere motive, and we are not prepared to say beyond a reasonable doubt that the district court's error had little, if any, likelihood of altering the jury's determination that Marsh committed capital murder. See *Chapman v. California*, 386 U.S. 18, 23-24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967). Upon remand, the district court must carefully consider the relevancy of each "piece" of challenged evidence to avoid prejudicing Marsh's right to present his theory of defense.

We conclude a new trial must be ordered for the crimes of capital murder and aggravated arson.

## CONSTITUTIONALITY OF K.S.A. 21-4624(e)

At the penalty phase of Marsh's trial, the district court's jury instructions and verdict forms followed the language of K.S.A. 21-4624(e) by requiring a death sentence if the jury found aggravating circumstances were not outweighed by mitigating circumstances. The governing statute reads:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced as provided by law." K.S.A. 21-4624(e).

Under the authority of this provision, Marsh's jury was directed that a tie must go to the State. In the event of equipoise, *i.e.*, the jury's determination that the balance of any aggravating circumstances and any mitigating circumstances weighed equal, the death penalty would be required.

Since Marsh's sentencing proceeding, we decided *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001).

In *Kleypas*, we first held that the weighing equation in K.S.A. 21-4624(e) as written was unconstitutional under the Eighth and Fourteenth Amendments. We avoided striking the statute down as unconstitutional on its face only by construing it to mean the opposite of what it said, *i.e.*, to require aggravating circumstances to outweigh mitigating circumstances. 272 Kan. 894, Syl. ¶ ¶ 45-48. This reasoning compelled us to vacate Kleypas' death sentence and remand the case for reconsideration of the death penalty under proper instructions on the weighing equation. 272 Kan. 894, Syl. ¶ 49.

In *Kleypas*, after the majority determined that K.S.A. 21-4624(e) as written violated the Eighth and Fourteenth Amendments, it added:

"Our decision does not require that we invalidate K.S.A. 21-4624 or the death penalty itself. We do not find K.S.A. 21-4624(e) to be unconstitutional on its face, but rather, we find that the weighing equation impermissibly mandates the death penalty when the jury finds that the mitigating and aggravating circumstances are in equipoise." 272 Kan. at 1016.

"The legislative intent in passing the death penalty act is obvious. K.S.A. 21-4624 provides for a death sentencing scheme by which a sentence of death is imposed for certain offenses. By simply invalidating the weighing equation and construing K.S.A. 21-4624(e) to provide that if the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 exists and, further, that such aggravating circumstance or circumstances outweigh any mitigating circumstance found to exist, the defendant shall be sentenced to death, the intent of the legislature is carried out in a constitutional manner. So construed, we hold that K.S.A. 21-4624 does not violate the Eighth Amendment prohibition against cruel and unusual punishment. Our holding requires that this case be remanded for the jury to reconsider imposition of the death penalty." 272 Kan. at 1018.

Here, Marsh correctly notes, and the State concedes, that *Kleypas* requires us to vacate Marsh's death sentence and remand for reconsideration of the death penalty under proper instructions on the weighing equation. Marsh makes the further argument, however, that K.S.A. 21-4624(e) is unconstitutional on its face and that the portion of our *Kleypas* decision that saved the statute through judicial construction must be overruled.

We agree.

After a discussion of applicable case law, the *Kleypas* majority succinctly summarized why K.S.A. 21-4624(e) as written did not comport with the Eighth and Fourteenth Amendments:

"The legislature cannot mandate a death sentence for any category of murder. The legislature is limited to defining who is eligible, within constitutional limits, to receive the death penalty. It is for the jury, within permissible guidelines, to determine who will live and who will die. The issue is not whether the penalty of death is per se cruel and unusual punishment. *Furman [v. Georgia,* 408 U.S. 238] did not hold that the death penalty was cruel and unusual punishment per se under the Eighth Amendment. Here the issue, as that before the *Furman* court, is whether the process used to select which defendant will receive the irrevocable penalty of death 'comports with the basic concept of human dignity at the core of the [Eighth] Amendment.' *Gregg [v. Georgia,]* 428 U.S. at 183.

"Is the weighing equation in K.S.A. 21-4624(e) a unique standard to ensure that the penalty of death is justified? Does it provide a higher hurdle for the prosecution to clear than any other area of criminal law? Does it allow the jury to express its 'reasoned moral response' to the mitigating circumstances? We conclude it does not. Nor does it comport with the fundamental respect for humanity underlying the Eighth Amendment. Last, fundamental fairness requires that a 'tie goes to the defendant' when life or death is at issue. We see no way that the weighing equation in K.S.A. 21-4624(e), which provides that in doubtful cases the

jury must return a sentence of death, is permissible under the Eighth and Fourteenth Amendments." 272 Kan. at 1015-16.

In dissent, Justice Davis disagreed with the majority's holding that the weighing equation *as written* in K.S.A. 21-4624(e) was unconstitutional. 272 Kan. at 1125. Chief Justice McFarland joined in the dissent, and Justice Abbott, writing separately, concurred with Justice Davis. 272 Kan. at 1136.

Since *Kleypas* was decided, there have been no persuasive Eighth or Fourteenth Amendment cases helpful to a resolution of the facial constitutionality questions. Although *Ring v. Arizona,* 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002), overruled *Walton v. Arizona,* 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), which had been relied upon by the *Kleypas* majority, it did so only on a distinct point of law, *i.e.,* whether a jury or a judge must make the findings required on aggravating and mitigating circumstances.

In their dissents today, Justices Davis and Nuss nevertheless revisit the constitutionality of K.S.A. 21-4624(e) as written. They, joined by Chief Justice McFarland, argue first that equipoise will be rare. We cannot know this.

Second, they focus on cases that predate *Walton* and analyze distinct statutory language, asserting these decisions mean the Constitution guarantees capital defendants only an opportunity to have mitigating evidence considered by the jury. These cases, obviously, do not control.

Finally, our dissenting colleagues protest that we should rely on language in Justice Blackmun's *Walton* dissent to conclude that a majority of the United States Supreme Court has already implicitly decided that the equipoise provision before us is constitutional. Simply stated, that position failed to draw a majority in *Kleypas;* Justices Lockett, Allegrucci, Six, and Larson voted against it. It still fails to draw a majority for good reason. Although we do not believe any useful purpose is served by further extensive restatement of the opposing rationales of the *Kleypas* majority and dissent, we feel compelled to re-emphasize that a majority of the United States Supreme Court has never squarely addressed or decided the facial

constitutionality of the equipoise provision before us. This remains true, no matter how lower federal courts or other state courts have interpreted the ruling in *Walton.* The Arizona statute at issue in that case was worded differently; and, as Justice Nuss acknowledges, Justice White's plurality decision neither used the word "equipoise" nor specifically referred to situations in which aggravators and mitigators are in balance. After full reconsideration, we reject reliance on Justice Blackmun's *Walton* dissent and continue to adhere to the *Kleypas* majority's reasoning and holding that K.S.A. 21-4624(e) as written is unconstitutional under the Eighth and Fourteenth Amendments.

This brings us to the next issue: whether *Kleypas* properly construed the statute to reverse the effect of equipoise under the weighing equation. As Justice Davis recently emphasized,

" 'it is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. [Citation omitted.] The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. [Citation omitted.] Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute. [Citation omitted.]' " *State ex rel. Graeber v. Marion County Landfill, Inc.*, 276 Kan. 328, 339, 76 P.3d 1000 (2003) (quoting *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

We also are mindful of additional canons of statutory interpretation related to constitutional challenges:

"The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. Statutes are not stricken down unless the infringement of the superior law is clear beyond a reasonable doubt. [Citation omitted.]" *State v. Engles*, 270 Kan. 530, 531, 17 P.3d 355 (2001).

" ' "[A] statute apparently void on its face may be constitutional when limited and construed in such a way as to uphold its constitutionality by reading the necessary judicial requirements into the statute. This has often been done when it is clear

that such an interpretation will carry out the intent of the legislature. *State v. Motion Picture Entitled 'The Bet'*, 219 Kan. 64, 70, 547 P.2d 760 (1976); *State v. Gunzelman*, 210 Kan. 481, 502 P.2d 705 (1972); *State v. Hart*, 200 Kan. 153, 434 P.2d 999 (1967)." ' " *Kleypas,* 272 Kan. at 1017.

Applying these two canons in *Kleypas*, we held that the unconstitutional weighing equation in K.S.A. 21-4624(e) could be construed to carry out the legislature's intent to enact a constitutional death penalty statute. 272 Kan. at 1018. This approach is commonly referred to by legal scholars as the "avoidance doctrine" or the "rule of constitutional doubt."

As articulated by the United States Supreme Court, the rule of constitutional doubt is that the Supreme Court will not strike down a statute as unconstitutional if the statute can be construed, in a manner consistent with the will of Congress, to comport with constitutional limitations. This rule of constitutional construction was described as follows in *Almendarez-Torres v. United States*, 523 U.S. 224, 238, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998):

" 'This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations.' [Citations omitted.] The doctrine seeks in part to minimize disagreement between the branches by preserving congressional enactments that might otherwise founder on constitutional objections. It is not·designed to aggravate that friction by creating (through the power of precedent) statutes foreign to those Congress intended, simply through fear of a constitutional difficulty that, upon analysis, will evaporate. Thus, those who invoke the doctrine must believe that the alternative is a serious likelihood that the statute will be held [to be] unconstitutional. Only then will the doctrine serve its basic democratic function of maintaining a set of statutes that reflect, rather than distort, the policy choices that elected representatives have made. For similar reasons, the statute must be genuinely susceptible to two constructions after, and not before, its complexities are unraveled. Only then is the statutory construction that avoids the constitutional question a 'fair' one."

In short, the United States Supreme Court is willing to exercise its power to construe statutes in a constitutional manner to save a legislative enactment rather than strike it down. However, both the United States Supreme Court and this court have acknowledged that the power to construe away constitutional infirmity is limited. " 'Statutes should be construed to avoid constitutional questions, but this interpretative·canon is not a license for the judiciary to

rewrite language enacted by the legislature.'" *Salinas v. United States*, 522 U.S. 52, 59-60, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997). "We cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." *United States v. Locke*, 471 U.S. 84, 96, 85 L. Ed. 2d 64, 105 S. Ct. 1785 (1985). The maxim cannot apply where the statute itself is unambiguous. *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 494, 149 L. Ed. 2d 722, 121 S. Ct. 1711 (2001).

Our formulation of the avoidance doctrine is similar to that of the federal courts. In *State v. Durrant*, 244 Kan. 522, 534, 769 P.2d 1174 (1989), we stated:

"This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute. To accomplish this purpose the court may read the necessary judicial requirements into the statute."

These cases make plain that the avoidance doctrine is applied appropriately *only* when a statute is ambiguous, vague, or overbroad. The doctrine is not an available tool of statutory construction if its application would result in rewriting an unambiguous statute. The court's function is to interpret legislation, not rewrite it. *State v. Beard*, 197 Kan. 275, 278, 416 P.2d 783 (1966); *Patrick v. Haskell County*, 105 Kan. 153, 181 Pac. 611 (1919).

It is apparent to us that *Kleypas* failed to apply the fundamental rule of statutory construction as stated in *State ex rel. Graeber* before moving to application of the canons that support the avoidance doctrine. Indeed, the fundamental rule of statutory construction was not even noted in the majority's discussion and resolution of the equipoise issue.

Moreover, the *Kleypas* court's rationale for the rewriting of K.S.A. 21-4624(e) rested entirely upon the premise that the legislature intended to pass a death penalty statute that was constitutional. 272 Kan. at 1018. This begged the question of whether the legislature actually *succeeded* in doing so. It also constituted an insufficient justification for application of the avoidance doctrine to an unambiguous statute. Such construction by any other name is a usurpation of the legislative prerogative. See *Beard*, 197 Kan.

at 278; see also *People v. LaValle,* 3 N.Y. 3d 88, 817 N.E. 2d 341 (2004) (state's highest court cannot rewrite unconstitutional death penalty provision; it lacks legislative power to fill void left by elimination of invalid provision).

This point was not lost upon Justice Davis in his *Kleypas* dissent. His explanation was, and still is, persuasive:

"The majority reverses the weighing equation adopted by the legislature in K.S.A. 21-4624(e) with the idea that the intent of the legislature is to be carried out in a constitutional manner. There is no question, based on the express language of the legislature, that it intended to mandate the imposition of a death sentence where the existence of such aggravating circumstances is not outweighed by any mitigating circumstances found to exist. The precise question was brought to the attention of the legislature in testimony by the attorney general, who recommended that the statute provide for the aggravating circumstances to outweigh the mitigating circumstances before a death sentence may be imposed. The legislature rejected that suggestion of the attorney general and adopted our present statute.

"The majority, however, replaces the express language with its own language based upon its conclusion that this new language carries out the intent of the legislature in a constitutional manner. Because the new language mandated by the majority is contrary to the expressed intent and language adopted by the legislature in K.S.A. 21-4624(e), I believe the majority *invades the province of the legislature.* In the face of a clearly expressed legislative intent, the majority not only strikes this clear language as unconstitutional but adopts language exactly the opposite of what the legislature stated. If the language of the statute offends the Constitution, the appropriate judicial solution, in my opinion, is to so hold and let the legislature resolve the matter consistent with the court's opinion." 272 Kan. at 1124-25.

We agree with Justice Davis' reasoning and conclusion that the *Kleypas* majority erred in substituting a weighing equation with exactly the opposite effect of the equation provided by the legislature. The holding eviscerated the legislature's clear and unambiguous intent regarding equipoise and thus overstepped the judiciary's authority to interpret legislation rather than make it. Chief Justice McFarland's dissent, which argues that the legislature apparently did not mind the interference misses the point. (It also reads too much into its inaction when the court had removed its incentive to act.) Justice Davis had it exactly right: The appropriate, limited judicial response to the problem identified for the first time

in *Kleypas* was to hold K.S.A. 21-4624(e) unconstitutional on its face and let the legislature take such further action as it deemed proper.

This was especially true given the legislative history. As the *Kleypas* majority observed:

"It is important to note that on March 14, 1995, the attorney general analyzed the statute and recommended in the House Judiciary Committee of the Kansas Legislature that the statute be amended to require that aggravating circumstances outweigh mitigating circumstances, stating: "Now if they are equal, 'tie' goes to state. We're proposing 'tie' goes to defense. . . ." Unfortunately, the legislature did not follow the attorney general's recommendation." *Kleypas*, 272 Kan. at 1014-15.

In *Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002), the bedrock principle of separation of powers in our tripartite form of government was at issue and eloquently explained. Padilla, an American citizen, was being held by the United States as an "enemy combatant" associated with Al Qaeda at a naval brig in South Carolina. He filed a habeas petition, relying primarily upon 18 U.S.C. § 4001(a) (2000), which provides: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." In support of its motion to dismiss, the Government argued a literal reading of 18 U.S.C. § 4001(a) would conflict with Article II, section 2, clause 1 of the Constitution, which makes the President of the United States "Commander in Chief of the Army and Navy of the United States."

In rejecting the government's argument, the court stated:

"The government suggests that because reading the statute to impinge on the President's Article II powers, including detention of enemy combatants, creates a danger that the statute might be found unconstitutional as applied to the present case, a court should read the statute so as not to cover detention of enemy combatants, applying the canon that a statute should be read so as to avoid constitutional difficulty. *See, e.g., Jones v. United States*, 529 U.S. 848, 857, 120 S. Ct. 1904, 146 L. Ed. 2d 902 (2000) (citing 'the guiding principle that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." ') (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408, 29 S. Ct. 527, 53 L. Ed. 836 (1909)).

"However, this doctrine of constitutional avoidance ' "has no application in the absence of statutory ambiguity." ' *HUD v. Rucker*, 535 U.S. 125, 122 S. Ct. 1230,

1235, 152 L. Ed. 2d 258 (2002) (quoting *United States v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 494, 121 S. Ct. 1711, 149 L. Ed. 2d 722 (2001)). Any other approach, as pointed out in *Rucker,* ' "while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution." ' *Id.* at 1235-36 (quoting *United States v. Albertini,* 472 U.S. 675, 680, 105 S. Ct. 2897, 86 L. Ed. 2d 536 (1985)). That is, if a court read an ambiguity into an unambiguous statute simply for the purpose of avoiding an adverse decision as to the constitutionality of that statute, the court would be exercising legislative powers and thereby usurping those powers. There is no ambiguity here. The plain language of the statute encompasses all detentions of United States citizens. Therefore, the constitutional avoidance canon cannot affect how the statute is read." 233 F. Supp. 2d at 597.

Our holding that K.S.A. 21-4624(e) is unconstitutional on its face presumptively requires that we overrule that portion of *Kleypas* upholding the statute through application of the avoidance doctrine. The only contrary argument left for our consideration is that the doctrine of stare decisis should prevent us from doing so.

In *Samsel v. Wheeler Transport Services, Inc.,* 246 Kan. 336, 356, 789 P.2d 541(1990), *overruled on other grounds Bair v. Peck,* 248 Kan. 824, 811 P.2d 1176 (1991), we stated:

"It is recognized under the doctrine of stare decisis that, once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised. Stare decisis operates to promote system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by this court. . . . The application of stare decisis ensures stability and continuity— demonstrating a continuing legitimacy of judicial review. Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law.

". . . The general American doctrine as applied to courts of last resort is that a court is not inexorably bound by its own precedents but will follow the rule of law which it has established in earlier cases, unless clearly convinced that the rule was originally erroneous or is not longer sound because of changing conditions and that more good than harm will come by departing from precedent."

This is consistent with the United States Supreme Court's 2003 decision in *Lawrence v. Texas,* 539 U.S. 558, 156 L. Ed. 2d 508, 525, 123 S. Ct. 2472 (2003), in which the Court overruled its 1986 decision in *Bowers v. Hardwick,* 478 U.S. 186, 92 L. Ed. 2d 140, 106 S. Ct. 2841 (1986). The Court stated:

"The doctrine of *stare decisis* is essential to the respect accorded to the judgments of the Court and to the stability of the law. It is not, however, an inexorable command. *Payne v. Tennessee*, 501 U.S. 808, 828, 115 L. Ed.2d 720, 111 S. Ct. 2597 (1991) ('*Stare decisis* is not an inexorable command; rather, it "is a principle of policy and not a mechanical formula of adherence to the latest decision, [however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience]" ' (quoting *Helvering v. Hallock*, 309 U.S. 106, 119, 84 L. Ed. 604, 60 S. Ct. 444 (1940))." 539 U.S. at 577.

Similarly, in *Ring*, 536 U.S. 584, the Court observed that, "[a]lthough ' "the doctrine of *stare decisis* is of fundamental importance to the rule of law[,]" . . . [o]ur precedents are not sacrosanct.' *Patterson v. McLean Credit Union*, 491 U.S. 164, 172 (1989), (quoting *Welch v. Texas Dept. of Highways and Public Transp.*, 483 U.S. 468, 494 (1987). '[W]e have overruled prior decisions where the necessity and propriety of doing so has been established.' 491 U.S. at 172."

In particular, the United States Supreme Court has frequently emphasized that stare decisis has less persuasive force in constitutional adjudication. As Justice Scalia stated in *Vieth v. Jubelirer*, 541 U.S. 267, 305-06, 158 L. Ed 2d 546, 124 S. Ct. 1769, 1792 (2004), which overturned precedent concerning congressional redistricting:

"Considerations of stare decisis do not compel us to allow *Bandemer* to stand. That case involved an interpretation of the Constitution, and the claims of stare decisis are at their weakest in that field, where our mistakes cannot be corrected by Congress. See *Payne v. Tennessee*, 501 U.S. 808, 828, 111 S. Ct. 2697, 115 L. Ed. 2d 720 (1991). They are doubly weak in *Bandemer* because the majority's inability to enunciate the judicially discernible and manageable standard that it thought existed (or did not think did not exist) presaged the need for reconsideration in light of subsequent experience. And they are triply weak because it is hard to imagine how any action taken in reliance upon *Bandemer* could conceivably be frustrated—except the bringing of lawsuits, which is not the sort of primary conduct that is relevant.

"While we do not lightly overturn one of our own holdings, 'when governing decisions are unworkable or are badly reasoned, " 'this Court has never felt constrained to follow precedent.' " *Id.*, at 827, 111 S. Ct. 2597 (quoting *Smith v. Allwright*, 321 U.S. 649, 665, 64 S. Ct. 757, 88 L. Ed. 2d 987 (1944)). Eighteen years of essentially pointless litigation have persuaded us that *Bandemer* is incapable of principled application. We would therefore overrule that case, and de-

cline to adjudicate these political gerrymandering claims." See also *Harris v. United States,* 536 U.S. 545, 581, 153 L. Ed. 2d 524, 122 S. Ct. 2406 (2002) (Thomas, J., dissenting) (when court "has wrongly decided a constitutional question, the force of stare decisis is at its weakest"; relative recency of rule also weakens precedential value).

Furthermore, a rule not previously subjected to "full-dress argument" is rightly examined more closely before it is applied a second time. See *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 571, 124 L. Ed. 2d 472, 113 S. Ct. 2217 (1993). Such should be the case with our *sua sponte* application of the avoidance doctrine in *Kleypas.* Although we should not casually discard precedent, neither should we shy away from admitting " 'when governing decisions are unworkable or are badly reasoned.' " *United States v. Dixon,* 509 U.S. 688, 712, 125 L. Ed. 2d 556, 113 S. Ct. 2849 (1993) (citing *Payne v. Tennessee,* 501 U.S. at 827).

The Chief Justice's dissent focuses on factors listed by Justice O'Connor in *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992), "prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case." 505 U.S. at 854-55. But Justice O'Connor explicitly labeled "examples." Any exhaustive list of such considerations necessarily would also include whether the court now recognizes that its earlier ruling was incorrect, unwise, or did violence to the roles assigned the various branches of government.

We conclude that the second holding of *Kleypas*—that the equipoise provision could be rescued by application of the avoidance doctrine—is not salvageable under the doctrine of stare decisis. That holding of *Kleypas* is overruled. Stare decisis is designed to protect well settled and sound case law from precipitous or impulsive changes. It is not designed to insulate a questionable constitutional rule from thoughtful critique and, when called for, abandonment. This is especially true in a situation like the one facing us here. *Kleypas'* application of the avoidance doctrine was not fully vetted. It is young and previously untested. Its rewriting of K.S.A.

21-4624(e) was not only clearly erroneous; as a constitutional adjudication, it encroached upon the power of the legislature.

Our decision today to confine the application of the avoidance doctrine to appropriate circumstances recognizes the separation of powers and the constitutional limitations of judicial review and rightfully looks to the legislature to resolve the issue of whether the statute should be rewritten to pass constitutional muster. This is the legislature's job, not ours. This decision does more in the long run to preserve separation of powers, enhance respect for judicial review, and further predictability in the law than all the indiscriminate adherence to stare decisis can ever hope to do.

## HARD 40 SENTENCE—SUFFICIENCY

Marsh contends there was insufficient evidence to support the district court's finding of aggravating circumstances not outweighed by mitigating circumstances. See K.S.A. 2003 Supp. 21-4635. Where the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 proceeding, the standard of review to be applied is whether, after reviewing all the evidence, viewed in the light most favorable to the State, a rational factfinder could have found the existence of the aggravating circumstances by a preponderance of the evidence.

In imposing the hard 40, the district court found the same aggravators as did the jury in imposing the death penalty: (1) the defendant knowingly or purposely killed or created a great risk of death to more than one person; (2) the killing was especially heinous, atrocious, or cruel; and (3) the killing was committed in order to avoid or prevent a lawful arrest or prosecution. Further, in applying the weighing equation as required in K.S.A. 2003 Supp. 21-4635, the district judge stated:

"I believe that these aggravating factors, *each one individuallythat you wouldn't necessarily need to take the three of them as a whole combinedthat any one of those three are sufficient to outweigh any mitigating circumstances in this case* regarding the death of [Marry], which would require the imposition of the maximum penalty." (Emphasis added.)

Because we have concluded Marsh is entitled to a new trial on the charge of capital murder, a finding he knowingly or purposely killed or created a great risk of death to more than one person is problematic. Likewise, the district court's failure to admit evidence of Pusch's possible involvement could arguably influence the finding that Marry's killing was especially heinous, atrocious, or cruel. There does exist, however, sufficient evidence to support the district court's finding that Marry's murder was committed by Marsh to avoid or prevent a lawful arrest or prosecution. In his confession to investigators, Marsh indicated that, after he entered the Pusch residence, he decided not to carry out the extortion; but Marry's early arrival threw him into a panic, and he shot her. The district court could reasonably infer Marsh shot Marry to avoid lawful arrest or prosecution for aggravated burglary. Conversely, the mitigating evidence presented by Marsh consisted of several character witnesses who testified to Marsh's character at the time they had known him.

We conclude, based upon the district court's statement, that any one of the aggravating circumstances was not outweighed by mitigating circumstances. The district court's imposition of the hard 40 sentence is upheld. See *State v. Lopez*, 271 Kan. 119, 141, 22 P.3d 1040 (2001) (stating the district court's weighing of aggravating and mitigating circumstances is within its sound discretion and will not be disturbed on appeal absent an abuse of discretion.)

## HARD 40 SENTENCE—CONSTITUTIONALITY

Marsh argues the Kansas hard 40 sentencing scheme is unconstitutional because K.S.A. 2003 Supp. 21-4635 does not require aggravating circumstances to be submitted to a jury and proved beyond a reasonable doubt. He contends *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), should be overruled.

This argument was not made to the district court. Normally, constitutional grounds asserted for the first time are not properly before this court for review. *State v. Shears*, 260 Kan. 823, 837, 925 P.2d 1136 (1996). However, we have long recognized three exceptions to this rule: (1) where the newly asserted claim involves

only a question of law arising on proved or admitted facts and determinative of the case; (2) where consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) where the district court is right for the wrong reason. See *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-81, 434 P.2d 858 (1967). Here, the issue raised by Marsh requires we address only a question of law.

In *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), the United States Supreme Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Conley*, we held the hard 40 sentencing scheme did not increase the statutory maximum, but rather simply set a statutory minimum. See 270 Kan. at 33-34. We also concluded our holding was consistent with the United States Supreme Court's pronouncement in *McMillan v. Pennsylvania*, 477 U.S. 79, 88-89, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986). In *McMillan*, the Court held a judicial finding of aggravating factors that only raises the minimum sentence that may be imposed by the district court was permissible. 477 U.S. at 89.

Marsh argues the United States Supreme Court's ruling in *Ring v. Arizona*, 536 U.S. 584, requires us to reverse our holding in *Conley*. We disagree. In *State v. Boldridge*, 274 Kan. 795, 57 P.3d 8 (2002), this court addressed a constitutional challenge to the hard 50 sentencing scheme under K.S.A. 2001 Supp. 21-4635. The court noted the defendant's reliance on *Ring* but found no reason to alter its reasoning and holdings in *State v. Douglas,* 274 Kan. 96, 49 P.3d 446 (2002), *Conley,* and *State v. Boorigie*, 273 Kan. 18, 41 P.3d 764 (2002). *Boldridge*, 274 Kan. at 812.

Additionally, Marsh contends we misread *McMillan* in deciding *Conley*. This is not a novel argument. We have consistently declined to overrule *Conley* and have rejected the argument that our reliance on *McMillan* was misplaced. See *State v. Albright*, 273 Kan. 811, 826-27, 46 P.3d 1167 (2002). The decision in *Harris v. United States*, 536 U.S. 545, 153 L. Ed. 2d 524, 122 S. Ct. 2406 (2002), decided the same day as *Ring*, reaffirms the continuing

validity of *McMillan*. In *Harris*, the Supreme Court considered *Apprendi* but held that increasing a defendant's minimum sentence based upon a judge's finding that a weapon was brandished did not violate the Fifth or Sixth Amendments. *Harris*, 536 U.S. at 568.

For the foregoing reasons, we reject Marsh's argument that *Conley* was wrongly decided and should be overruled.

## CONCLUSION

We conclude K.S.A. 21-4624(e) is unconstitutional on its face, thus rendering moot guilt and penalty phase issues dependent on imposition of the death penalty. We have carefully considered all of the issues of trial error raised by Marsh; we hold those not discussed in this opinion insufficient to constitute reversible error in this case.

We affirm Marsh's convictions and sentences for aggravated burglary and the premeditated murder of Marry; we reverse and remand for new trial Marsh's convictions for the capital murder of M.P. and aggravated arson.

DAVIS, J., dissenting: I respectfully dissent from the majority's holding that the weighing equation in K.S.A. 21-4624(e) is unconstitutional on its face. In my opinion, K.S.A. 21-4624(e) was constitutional when it was passed by the Kansas Legislature and remains constitutional today.

The majority holds that the Kansas death penalty is unconstitutional on its face under the Eighth Amendment to the United States Constitution. According to the majority, the offending provision lies in the following weighing equation found in K.S.A. 21-4624(e):

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the *existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist*, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced as provided by law." (Emphasis added.)

In *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001), the majority held that the above weighing equation was unconstitutional

but attempted to salvage the death penalty by rewriting the equation language to provide that the aggravating circumstances must outweigh the mitigating circumstances before death may be imposed. The majority today holds that the attempt in *Kleypas* was erroneous and that the entire death penalty is unconstitutional under the Eighth Amendment.

The majority, in this case, voids the entire death penalty law because in the extremely unlikely event that a jury would find that the aggravating circumstance or circumstances exactly equal the mitigating circumstances, death must be imposed. The majority claims that in such an unlikely event a tie must go to the defendant. According to the majority, because under the weighing equation adopted by the Kansas Legislature the tie goes to the State, the entire death penalty is unconstitutional.

I begin with the majority's conclusion that in order for the death penalty to be constitutional in Kansas, *a tie in the aggravating circumstances and mitigating circumstances must go to the defendant* under the Eighth Amendment. I agree with the majority that the Kansas Legislature consciously chose the weighing equation but strongly disagree that the language used is unconstitutional under the Eighth Amendment. I may personally disagree with the legislature's policy decision that a tie goes to the State but I cannot conclude that its enactment is unconstitutional because of that language unless the United States Constitution, as interpreted by the United States Supreme Court, supports such a conclusion. An analysis of the United States Supreme Court jurisprudence, as well as other decisions addressing this point, does not support such a conclusion and, in fact, supports the opposite conclusion.

As a prelude to my analysis, I think it is important to stress just how unlikely it is that the "tie" envisioned by the majority would ever occur. First, before the weighing equation is even implicated, it must be proven beyond a reasonable doubt that the defendant is guilty of the crime of capital murder. Thus, for the defendant to even be eligible for the death penalty, a jury must find the existence of one or more of the following factors that make the murder committed more serious then even first-degree murder: (1) the intentional and premeditated killing of any person in the commission of

kidnapping or aggravated kidnapping with the intent of holding such person for ransom; (2) the intentional and premeditated killing of any person pursuant to contract or agreement; (3) the intentional and premeditated killing of any person by an inmate or prisoner; (4) the intentional and premeditated killing of the victim of rape, criminal sodomy, or aggravated criminal sodomy; (5) the intentional and premeditated killing of a law enforcement officer; (6) the intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct; or (7) the intentional and premeditated killing of a child under the age of 14 in the commission of kidnapping or aggravated kidnapping where such crime was committed with the intent to commit a sex offense upon or with the child or with intent that the child commit or submit to a sex offense. See K.S.A. 21-3439.

Once the defendant has been convicted of capital murder, he or she is death eligible. However, the death sentence may still not be imposed without a consideration of an additional set of aggravating circumstances and a consideration of mitigating circumstances. The aggravating circumstances are set forth in K.S.A. 21-4625, as follows:

"(1) The defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another.

"(2) The defendant knowingly or purposely killed or created a great risk of death to more than one person.

"(3) The defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value.

"(4) The defendant authorized or employed another person to commit the crime.

"(5) The defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution.

"(6) The defendant committed the crime in an especially heinous, atrocious or cruel manner.

"(7) The defendant committed the crime while serving a sentence of imprisonment on conviction of a felony.

"(8) The victim was killed while engaging in, or because of the victim's perform-
ance or prospective performance of, the victim's duties as a witness in a criminal
proceeding."

These eight categories of aggravating circumstances, all extremely
serious, qualify a defendant for death only after the prosecution
has proved the existence of one or more of them beyond a reason-
able doubt. However, death may still not be imposed without con-
sideration of mitigating circumstances.

A nonexclusive list of mitigating circumstances that a defendant
may present to the jury are set out in K.S.A. 2003 Supp. 21-4626:

"(1) The defendant has no significant history of prior criminal activity.

"(2) The crime was committed while the defendant was under the influence of
extreme mental or emotional disturbance.

"(3) The victim was a participant in or consented to the defendant's conduct.

"(4) The defendant was an accomplice in the crime committed by another person,
and the defendant's participation was relatively minor.

"(5) The defendant acted under extreme distress or under the substantial domi-
nation of another person.

"(6) The capacity of the defendant to appreciate the criminality of the defendant's
conduct or to conform the defendant's conduct to the requirements of law was
substantially impaired.

"(7) The age of the defendant at the time of the crime.

"(8) At the time of the crime, the defendant was suffering from post-traumatic
stress syndrome caused by violence or abuse by the victim."

As stated above, these mitigating circumstances are nonexclusive.
Thus, the jury is instructed that mitigating circumstances it may
consider also include that "[a] term of imprisonment is sufficient
to defend and protect the people's safety from the defendant" as
well as "any other aspect of the defendant's character, background
or record, and any other aspect of the offense which was presented
in either the guilt or penalty phase which you find may serve as a
basis for imposing a sentence less than death." See PIK Crim.
56.00-D (2003 Supp.).

Note again the serious nature of the mitigating circumstances
and the fact that there is no limit on mitigating circumstances that
a defendant may present to the jury. Also note that the defendant

is not required to prove these circumstances beyond a reasonable doubt.

For example, assume that a defendant kills a witness who was to testify against him in his upcoming criminal trial (aggravating circumstance). Assume further that the defendant is 19 years old at the time, came from a broken home, was abused as a child, and has no significant past criminal history (mitigating circumstances). Once the prosecution has presented evidence of the aggravating circumstance(s) and the defendant has presented as much mitigating evidence as he wishes to the jury, it is now up to the jury to determine whether to impose the death sentence. Under our law, if the mitigating circumstances outweigh the aggravating circumstance(s) death *cannot* be imposed. If aggravating circumstances outweigh mitigating circumstances death *is* imposed. Before deliberations, the jury is instructed similar to the following:

1. If the jury unanimously finds beyond a reasonable doubt that the aggravating factor exists, and that the aggravating factor outweighs the mitigating circumstances found to exist, the sentence is death.

2. If the jury unanimously finds beyond a reasonable doubt that the aggravating factor exists, and that the mitigating circumstances found to exist outweigh the aggravating circumstance, a prison sentence is the sentence.

3. If the jury unanimously finds beyond a reasonable doubt that the aggravating factor exists, and that the aggravating factor is not outweighed by any mitigating circumstances found to exist (this would include situations where aggravating factor and mitigating circumstances are equal), the defendant is sentenced to death.

Each member of the jury then decides whether the aggravating factor has been proven beyond a reasonable doubt. Unless the jury unanimously concludes that at least one aggravating factor has been proven, death cannot be imposed. Once an aggravating factor has been proven, each juror decides what weight to give that aggravating factor and then what weight to give the mitigating factors. The total weight of the aggravating factor and the mitigating factors are then compared. In order to impose death, each member of the jury must find that the aggravating factor is not outweighed by the

mitigating factors. If even one member of the jury finds that the aggravating factor is outweighed by the mitigating factors, then the defendant cannot be sentenced to death. Further, as noted above, the jury is not limited on what mitigating evidence it can consider. Thus, even if a juror in our example determines that the mitigating circumstances offered by the defendant, *i.e.*, that he was 19 years old at the time, came from a broken home, was abused as a child, and has no significant criminal history, are insufficient to outweigh the aggravating factor, that juror still does not have to vote for death if there is any other circumstance or circumstances which in the juror's mind pushes the weight of the mitigating circumstances past the aggravating circumstance. Such circumstances can include the juror's feeling that life in prison is a sufficient sentence or simply that the defendant does not deserve to die.

As can be seen by the above example, the weighing process is not just a process of counting aggravating and mitigating circumstances. It is a process of assessing intangibles: looking at the total weight of the aggravating factors and comparing it to the total weight of the mitigating circumstances. It is for this reason that it is highly unlikely the jury will conclude that the aggravating circumstances and mitigating circumstances are exactly equal. Either the mitigating circumstances will outweigh the aggravating circumstances and a life sentence will be imposed or the aggravating circumstances will outweigh the mitigating circumstances and death will be imposed.

In the extremely unlikely event that the jury does find the aggravating circumstances and the mitigating circumstances to be exactly equal, K.S.A. 21-4624(e), as written, does mandate that the sentence be death. However, a careful examination of the United States Supreme Court's death penalty jurisprudence shows that this result does not violate the Eighth Amendment.

There is no question that the Eighth Amendment imposes several requirements with regard to capital sentencing. First, states are required to limit and channel the discretion of judges and juries "so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). In order for a capital sentencing scheme to pass

constitutional muster, it must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983).

The Kansas Death Penalty Act narrows the class of persons eligible for the death penalty in two ways. First, it requires a conviction of capital murder for death penalty eligibility rather than simply applying the death penalty to all first-degree murders. Second, it narrows that eligibility even further through the weighing of aggravating and mitigating factors during the penalty phase. Thus, the Kansas Legislature has limited and channeled the discretion of judges and juries "so as to minimize the risk of wholly arbitrary and capricious action" in accord with *Gregg v. Georgia*.

Further, even though the Eighth Amendment requires that jury discretion be guided, it also requires that the sentencer be allowed to retain sufficient discretion to consider all relevant mitigating evidence, so that it can ensure that " 'death is the appropriate punishment in a specific case.' " *Lockett v. Ohio*, 438 U.S. 586, 601, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976). To this end, the sentencer cannot "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. Further, the sentencer must be able to "give effect" to this evidence. *Penry v. Lynaugh*, 492 U.S. 302, 328, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989). Again, it must be noted that Kansas lists eight important mitigating circumstances and puts no limit on the number of such circumstances a defendant may present. The jury is instructed that it must consider and give effect to this evidence.

Once these core principles are satisfied, however, the Eighth Amendment requires no more. Rather, the Supreme Court has made it clear that within the above guidelines, states are given wide latitude to adopt the procedure through which these principles are carried out. See *Zant v. Stephens*, 462 U.S. at 890-91 (stating that

*"the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances"*). (Emphasis added.) The majority opinion says that the failure of the legislature to allow death only when aggravating circumstances outweigh mitigating circumstances is unconstitutional.

In enacting its death penalty statute, Kansas has chosen to follow the Florida system, which provides for aggravating circumstances which are then weighed against any mitigators found to exist as set forth above. See *Stringer v. Black*, 503 U.S. 222, 229-231, 117 L. Ed. 2d 367, 112 S. Ct. 1130 (1992). The Supreme Court held that the Florida system satisfied constitutional requirements in *Proffitt v. Florida*, 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976).

In states which follow the Florida system, *i.e.* "weighing states," questions have arisen over the composition of the weighing equation. The Supreme Court answered those questions in a series of three cases: *Blystone v. Pennsylvania*, 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078 (1990); *Boyde v. California*, 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990); and *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), *overruled on other grounds Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002).

In *Blystone*, the question was whether having a mandatory weighing equation which required death where the jury found that the aggravating circumstances outweighed the mitigating circumstances violated the Constitution. The argument was that this mandatory penalty somehow "limited the discretion of the jury" in contravention of *Lockett's* requirement that a capital jury be allowed to consider and give effect to all relevant mitigating evidence. See *Blystone*, 494 U.S. at 303.

The Supreme Court held that the Pennsylvania scheme satisfied the *Lockett* requirement for two reasons. First, the statute did not limit the mitigating factors that could be taken into account (Kansas does not limit the mitigating factors). Second, it did not automatically mandate death upon conviction for certain types of murder (nor does Kansas); rather, it mandated the imposition of death only after a finding that the aggravating circumstances outweighed the

mitigating circumstances. 494 U.S. at 305-06. The Supreme Court stated that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." 494 U.S. at 307. Further, the Supreme Court noted that it was not particularly concerned with the form or procedure used in establishing weighing equations so long as the requirement that the jury be allowed to consider and give effect to all relevant mitigating evidence is satisfied, stating: *"Within the constitutional limits defined by our cases, the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished."* (Emphasis added.) 494 U.S. at 309.

The next case concerning weighing equations, *Boyde v. California*, addressed a similar question with regard to California's weighing equation, which mandated death upon a jury's finding that the aggravating circumstances outweigh mitigating circumstances. The Supreme Court in *Boyde*, for the same reasons as in *Blystone*, found the statute constitutional. In the process, the Supreme Court reiterated that " '[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence' " and further stated that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.' " 494 U.S. at 377.

*Blystone* and *Boyde* stand, therefore, for the proposition that it is not unconstitutional for a weighing equation to mandate death upon certain findings, so long as the jury is allowed to consider and give effect to all relevant mitigating circumstances. They also confirm that a weighing equation which mandates death upon the jury's finding that aggravating circumstances outweigh mitigating circumstances satisfies this standard. They did not, however, address whether other versions of the weighing equation, specifically the weighing equation used in K.S.A. 21-4624(e), meet this standard. That question was left for the next "weighing equation" case, *Walton v. Arizona*, 497 U.S. 639.

*Walton* is particularly important to this case because of the similarities between the weighing equation at issue in *Walton* and that in K.S.A. 21-4624. The Arizona weighing equation in *Walton* provided that the sentencer (in that case, a judge) was to weigh the aggravating circumstances against the mitigating circumstances and impose death if there were "no mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 643-44. Although the words used are different, Arizona, then and now, has interpreted this weighing equation to mean exactly the same as the one used in K.S.A. 21-4624(e): Death is the penalty unless the aggravating circumstances are outweighed by the mitigating circumstances. See *State v. Gretzler*, 135 Ariz. 42, 53-55, 659 P.2d 1 (1983); *State v. Ysea*, 191 Ariz. 372, 375, 956 P.2d 499 (1998) (stating that "[i]f the judge finds one or more of the aggravating factors listed in § 13-703[F], the defendant is death eligible, and if the aggravating factors are not outweighed by mitigating factors listed in § 13-703[G], the resulting sentence is death"). See also *Walton*, 497 U.S. at 687 (Blackmun, J., dissenting) (stating that "[t]he Arizona Supreme Court repeatedly has indicated that a defendant's mitigating evidence will be deemed 'sufficiently substantial to call for leniency' only if the mitigating factors 'outweigh' those in aggravation").

Further, one of the issues in *Walton* was the same equipoise question faced in *Kleypas* and now in this case, the validity of the weighing equation under the Eighth Amendment. See *Walton*, 497 U.S. at 651-52. In order to understand the Court's holding on the issue, it is important to note that *Walton* reached the Supreme Court in part as the result of a split between the Arizona Supreme Court and the Ninth Circuit Court of Appeals on the equipoise issue. In *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988) (en banc), the Ninth Circuit Court of Appeals held that the Arizona death penalty scheme was unconstitutional for the same reason the majority opinion in this case holds the Kansas statute K.S.A. 21-4624(e) unconstitutional:

"While the statute does require balancing, it nonetheless deprives the sentencer of the discretion mandated by the Constitution's individualized sentencing requirement. *This is because in situations where the mitigating and aggravating*

*circumstances are in balance,* or, where the mitigating circumstances give the court reservation but still fall below the weight of the aggravating circumstances, the statute bars the court from imposing a sentence less than death. Thus, the presumption can preclude individualized sentencing as it can operate to mandate a death sentence, and we note that '[p]resumptions in the context of criminal proceedings have traditionally been viewed as constitutionally suspect.' " 865 F.2d at 1043-44. (Emphasis added.)

This ruling, however, conflicted with the decision of the Arizona Supreme Court which summarily upheld the constitutionality of the Arizona death penalty scheme in *State v. Walton,* 159 Ariz. 571, 584-85, 769 P.2d 1017 (1989). In order to resolve this split between the two cases, the United States Supreme Court granted *certiorari* in *Walton.* See *Walton,* 497 U.S. at 647 ("Because the United States Court of Appeals for the Ninth Circuit has held the Arizona death penalty statute to be unconstitutional for the reasons submitted by Walton in this case, see *Adamson v. Ricketts* [citation omitted], we granted certiorari . . . to resolve the conflict and to settle issues that are of importance generally in the administration of the death penalty.").

The Supreme Court of the United States addressed Walton's argument that because the Arizona statute provided that the court must impose the death penalty if one or more aggravating circumstances are found and the mitigating circumstances are insufficient to call for leniency, this created an unconstitutional presumption that death was the proper sentence. 497 U.S. at 651-52. The Court rejected this contention, stating:

"Our recent decisions in *Blystone v. Pennsylvania* [citation omitted] and *Boyde v. California* [citation omitted] foreclose this submission. *Blystone* rejected a challenge to a jury instruction based on a Pennsylvania statute requiring the imposition of the death penalty if aggravating circumstances were found to exist but no mitigating circumstances were present. We pointed out that '[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence,' [citation omitted] and concluded that because the Pennsylvania statute did not preclude the sentencer from considering any type of mitigating evidence, [citation omitted] it was consonant with that principle. In addition, the Court concluded that the statute was not 'impermissibly "mandatory" as that term was understood' in *Woodson v. North Carolina* [citation omitted] and *Roberts v. Louisiana* [citation omitted] because it did not automat-

ically impose death upon conviction for certain types of murder. [Citation omitted.] The same is true of the Arizona statute.

"Similarly, *Boyde v. California, supra,* upheld a pattern jury instruction which stated that '[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death.' [Citation omitted]. The Court specifically noted that 'there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and *States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'*" [Citation omitted.]

"Walton's arguments in this case are no more persuasive than those made in *Blystone* and *Boyde.*" (Emphasis added.) 497 U.S. at 651-52.

Justices Blackmun, Brennan, Marshall, and Stevens dissented from this holding, arguing that the fact that the Arizona statute required death if the aggravating and mitigating circumstances were in equipoise violated the Eighth Amendment. See 497 U.S. at 687 (Blackmun, J., dissenting). The dissenting opinion in *Walton* is the reason the majority in this case holds K.S.A. 21-4624(e) unconstitutional. *Walton,* however, rejected the equipoise argument, holding just the opposite of the majority opinion in this case.

*Walton* not only reaffirmed the holdings in *Blystone* and *Boyde* that it is not a violation of the Eighth Amendment to mandate death upon certain findings, such as that the aggravating factors outweigh the mitigating factors, but also extended that rationale to a weighing equation such as that used in Arizona which mandated death unless the mitigating factors were sufficiently substantial to call for leniency, that is, unless aggravating factors were not outweighed by the mitigating circumstances.

It is clear to me that the United States Supreme Court's opinion in *Walton* answered the equipoise question. The Ninth Circuit certainly thought it did. In *Adamson v. Lewis,* 955 F.2d 614, 619 (9th Cir. 1992), it recognized that *Walton* overturned its decision in *Adamson v. Ricketts* regarding the constitutionality of the Arizona death penalty. The Idaho Supreme Court also thought so. In *State v. Hoffman,* 123 Idaho 638, 646-47, 851 P.2d 934 (1993), the Idaho Supreme Court found that under *State v. Walton,* its statute which required a defendant to prove mitigating circumstances which outweighed aggravating circumstances was constitutional. The Illinois Supreme Court, in a decision which actually predated *Walton,*

cited *Blystone* for this same proposition. See *People v. Thomas*, 137 Ill. 2d 500, 542, 561 N.E.2d 57 (1990).

Cases decided by the United States Supreme Court since *Blystone, Boyde,* and *Walton* have continued with the theme established in those cases. In *Harris v. Alabama*, 513 U.S. 504, 512, 130 L. Ed. 2d 1004, 115 S. Ct. 1031 (1995), the Supreme Court, in finding that Alabama's death penalty scheme was not unconstitutional even though it did not give the judge guidance in determining whether to accept the jury's advisory verdict, reiterated: "We have rejected the notion that 'a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.' " Similarly, in *Buchanan v. Angelone*, 522 U.S. 269, 276, 139 L. Ed. 2d 702, 118 S. Ct. 757 (1998), the Court stated:

"In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. [Citations omitted.] *However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence.* [Citations omitted.] Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence.

"But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." (Emphasis added.)

Given the United States Supreme Court's continued insistence that the Constitution does not require a specific method for balancing aggravating and mitigating circumstances, and its specific approval of Arizona's weighing equation which is identical in practice to that in K.S.A. 21-4624(e), I find it difficult to understand how the majority comes to its conclusion that K.S.A. 21-4624(e) is unconstitutional on its face. Certainly, the conclusion cannot come from the cases which have addressed the subject. The few cases from other jurisdictions which might lend support to the majority's conclusion are entirely unpersuasive.

Besides our opinion in *Kleypas*, a weighing equation such as the one used in K.S.A. 21-4624(e) has been declared unconstitutional in only four cases: the aforementioned Ninth Circuit opinion in

*Adamson v. Ricketts,* 865 F.2d 1011; *Hulsey v. Sargent,* 868 F. Supp. 1090 (E.D. Ark. 1993); *People v. Young,* 814 P.2d 834 (Colo. 1991); and *State v. Biegenwald,* 106 N.J. 13, 524 A.2d 130 (1987). The circumstances of each of these cases, however, give them little weight.

First, *Adamson,* as the Ninth Circuit Court recognized, was abrogated by the Supreme Court's opinion in *Walton v. Arizona.* See *Adamson v. Lewis,* 955 F.2d at 619. This abrogation also causes problems for *Hulsey v. Sargent,* in that the federal district court in that case relied entirely on *Adamson v. Ricketts* for its decision and did not even mention the effect of *Walton.* See 868 F. Supp. at 1103. It is highly questionable whether the decision in *Hulsey* would have survived review by the Eighth Circuit Court of Appeals, given its express reliance on *Adamson v. Ricketts* and the Ninth Circuit's determination that *Adamson v. Ricketts* was abrogated by *Walton.* The State's appeal in *Hulsey,* however, was dismissed by the Eighth Circuit because the State failed to timely file its notice of appeal. See *Hulsey v. Sargent,* 15 F.3d 115, 118-19 (8th Cir. 1994).

Nor are the two state cases, *Biegenwald* and *Young,* persuasive. *Biegenwald* was decided in 1987, before *Blystone, Boyde,* and *Walton.* The New Jersey Supreme Court in *Biegenwald* found that "fundamental fairness" required that the defendant get the benefit of the doubt where the "explanations for his misconduct were equally as significant as the culpable aspects of that misconduct." See 106 N.J. at 62. However, this argument for fundamental fairness was not keyed to the United States Constitution but rather to New Jersey's "traditional concern for the rights of defendants charged with capital offenses" and the legislative history of the adoption of the weighing equation which suggested that the New Jersey legislature had actually meant to adopt a different equation requiring the aggravating factors to outweigh the mitigating factors. See 106 N.J. at 59-60.

Similarly, in *Young* the Colorado Supreme Court determined that a weighing equation which mandated death when the aggravating and mitigating factors were in equipoise would violate the requirement that a death penalty scheme would be rational and

reliable. See 814 P.2d at 845. In reaching this conclusion, the court distinguished the holding in *Walton* by clearly misinterpreting the Arizona weighing equation, stating that under the Arizona weighing equation, "[t]he sentencer must also determine whether those mitigating factors are outweighed by the aggravating factors . . . or, stated alternatively, are sufficient to call for leniency." 814 P.2d at 846. As noted above, the Arizona weighing equation is in reality, the opposite. See *Walton*, 497 U.S. at 687 (Blackmun, J., dissenting); *State v. Gretzler*, 135 Ariz. at 53-55. This misconstruction allowed the *Young* court to lump *Walton's* approval of the Arizona weighing equation in with the Supreme Court's approval of the weighing equations in *Blystone* and *Boyde* to conclude that *Walton* did not address the equipoise question. See 814 P.2d at 846. In the end, however, the *Young* court appeared unsure of its construction of the United States Constitution and instead held that even if its determination that the weighing equation violated the United States Constitution was incorrect, the weighing equation would violate the Colorado Constitution. 814 P.2d at 845-46.

This, then, is the sum total of authority for the proposition that a weighing equation which mandates death when aggravating and mitigating factors are in equipoise violates the Eighth Amendment: A Ninth Circuit case which the Ninth Circuit has recognized as having been abrogated by the United States Supreme Court; a federal district court case based entirely on that Ninth Circuit Court case; a New Jersey state case which predates any United States Supreme Court discussion of the issue and which is primarily based not on the United States Constitution but instead on New Jersey's "traditional concern for the rights of defendants charged with capital offenses," and a Colorado state case based primarily on the Colorado state constitution. This authority pales in comparison to that of a decision of the United States Supreme Court expressly authorizing such a weighing equation, see *Walton v. Arizona*, 497 U.S. 639, and the repeated assertions of the United States Supreme Court that no specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required. *Buchanan v. Angelone*, 522 U.S. 269, 276, 139 L. Ed. 2d 702, 118 S. Ct. 757 (1998). See *Walton*, 497

U.S. at 651-52; *Boyde v. California*, 494 U.S. at 377; *Blystone v. Pennsylvania*, 494 U.S. at 309.

There seems to be a general feeling among the majority that the weighing equation which mandates death in the highly unlikely event that the jury finds the aggravating and mitigating circumstances to be exactly equal in weight is somehow "unfair." While it is certainly within the province of this court to interpret the Eighth Amendment, we cannot do so in a vacuum. We cannot simply rely on our own inchoate feelings, but instead have a duty to examine, analyze, and apply the United States Supreme Court's jurisprudence on the matter. This is especially true in cases such as the one before us where the majority of the court holds that a statute enacted by the legislature violates the Constitution on its face and is, therefore, invalid. We have held:

"The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the Constitution. . . . Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt." *State v. Groschang*, 272 Kan. 652, 668, 36 P.3d 231 (2001).

This is not to say that we should not strike down statutes which clearly infringe on the Constitution. However, when a court takes such a step it is imperative that a clearly articulated reason be given and that it be explained how that reason fits into the United States Supreme Court's jurisprudence on the issue. The cases examined compel the opposite conclusion from the majority's decision.

It is ironic that the majority appears more than ready to adopt my dissenting opinion in *Kleypas* on the question of whether the statute could be saved if it did in fact violate the Constitution. That part of the dissent was written in an unsuccessful effort to compel the *Kleypas* majority to squarely address the question of the statute's constitutionality and to articulate its reasoning as to why K.S.A. 21-4624(e) violates the Constitution. It is unfortunate that the majority rushes to give me perhaps too much credit for my dissenting opinion that the statute, if unconstitutional, is unconstitutional on its face, but completely disregards the overriding theme of my dissent, which is that the statute is not unconstitutional at all. See *Kleypas*, 272 Kan. at 1124 (Davis, J., dissenting).

I respectfully dissent from the majority opinion because I conclude that K.S.A. 21-4624(e), as passed by the Kansas Legislature in 1994, was and is today constitutional under the Eighth Amendment to the United States Constitution.

MCFARLAND, C.J. and NUSS, J. join in the foregoing dissenting opinion.

NUSS, J., dissenting: I join Justice Davis for the reasons discussed in his dissenting opinion. I write a separate dissent primarily to elaborate upon one of his reasons: the controlling authority, over the instant case's issue of death at equipoise, of *Walton v. Arizona,* 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), *overruled on other grounds Ring v. Arizona,* 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002).

Ever since the United States Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972), many state legislatures have struggled to fashion death penalty statutes which the Supreme Court will not strike as unconstitutional. Their paths have been neither smooth nor straight because the Court's directions, and often its requirements, certainly have been less than clear and at least arguably less than consistent. Many legislatures could justifiably consider the constitutionality target in death penalty jurisprudence as a moving one. As described by one of the Supreme Court's own members, "[f]or state lawmakers, the lesson has been that a decision of this Court is nearly worthless as a guide for the future; though we approve or seemingly even require some sentencing procedure today, we may well retroactively prohibit it tomorrow." *Walton v. Arizona,* 497 U.S. at 668. (Scalia, J., concurring).

The Supreme Court did, however, bestow constitutional passing grades on state death penalty statutes in three cases in 1990: *Blystone v. Pennsylvania,* 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078 (1990); *Boyde v. California,* 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990); and *Walton.* As a result, if a state legislature can fashion a death penalty statute identical to any of those which were approved in these cases, then its statute should also receive a constitutional passing grade. The Kansas death penalty statute,

K.S.A. 21-4624, is functionally identical—on the issue of death at equipoise—to the Arizona death penalty statute approved in *Walton*. Accordingly, *Walton* controls. To demonstrate that *Walton* controls, I find it necessary to set forth below much of its specific language.

## WALTON

There is no question that the issue of death at equipoise was squarely before the *Walton* Court. As Justice Davis' dissent explains, the Supreme Court granted certiorari to resolve the conflict between the Arizona Supreme Court, which held its state death penalty statute to be constitutional, and the United States Court of Appeals for the Ninth Circuit, which held the statute to be unconstitutional "for the reasons submitted by Walton in this case, see *Adamson v. Ricketts*, 865 F.2d 1011 (1988) (en banc)." 497 U.S. at 647.

*Petitioner Walton's brief*

To identify "the reasons submitted by Walton in this case," one must consider his brief:

Petitioner Walton began by clearly stating his second "Question Presented" on p. 1 of his brief as follows:

"Whether Arizona's capital sentencing statute violates the Eighth and Fourteenth Amendments by:

"a) requiring that death be imposed if the defendant fails to prove the existence of *mitigating circumstances sufficiently substantial to call for leniency*; and

"b) precluding the sentencer from considering mitigating circumstances unless the defendant has established their existence by a preponderance of the evidence?" (Emphasis added.)

Next, petitioner Walton articulated the effect of this italicized statutory language—as interpreted by both the Arizona Supreme Court and the Ninth Circuit—on p. 33 of his brief. In the section titled "The Statutory Presumption in Favor of Death," he argued:

"Not only must Arizona capital defendants establish that particular mitigating circumstances exist, but they must show that these circumstances are 'sufficiently substantial to call for leniency.' . . . This statutory language tells an Arizona sentencing judge who finds even a single aggravating factor, that death must be imposed, unless—as the Arizona Supreme Court put it in Petitioner's case—*there*

*are 'out-weighing mitigating factors.' "* (citing *State v. Walton,* 159 Ariz. 571, 769 P.2d 1017 [1989]).

At p. 33, Walton then repeated the italicized statutory language's effect. He also clearly argued why he considered death at equipoise, which is connected to his argument regarding the statutory presumption in favor of death, to be violative of his constitutional rights:

"In *Adamson v. Ricketts,* [865 F.2d 1011 (9th Cir. 1988)], the Ninth Circuit succinctly described this system:

'Under the statute, once any single statutory aggravating circumstance has been established, the defendant must not only establish the existence of a mitigating circumstance, *but must also bear the risk of nonpersuasion that any mitigating circumstance will not outweigh the aggravating circumstance(s)* . . . The relevant clause in the statute—"sufficiently substantial to call for leniency"—thus imposes a presumption of death once the court has found the existence of any single statutory aggravating circumstance.' 865 F.2d at 1041-2 (footnotes omitted)." (Emphasis added.)

Finally, petitioner Walton again clearly presented the issue of death at equipoise on pp. 36-37 of his brief. In the section titled "The Removal of Sentencing Discretion," he argued:

"The Arizona statute is explicitly mandatory: it provides that the sentencer 'shall' impose a death sentence whenever a single aggravating circumstance is found and the defendant fails to meet his statutory burdens of proof. . . .

. . . .

". . . While the statute does require balancing, it nonetheless deprives the sentencer of the discretion mandated by the Constitution's individualized sentencing requirement. This is because *in situations where the mitigating and aggravating circumstances are in balance . . . the statute bars the court from imposing a sentence less than death. Thus, the presumption can preclude individualized sentencing as it can operate to mandate a death sentence. . . . Adamson v. Ricketts, supra,* 865 F.2d at 1043 (footnotes omitted)." (Emphasis added.)

## Plurality Opinion

Justice White, writing for the plurality, addressed the two subparts of petitioner Walton's second "Question Presented" in Sections III and IV of the opinion. See 497 U.S. at 649-652. In Section III, he expressly rejected Walton's contention "that the Arizona statute violates the Eighth and Fourteenth Amendments because it imposes on defendants the burden of establishing, by a prepon-

derance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." 497 U.S. at 649.

Then in Section IV of the plurality opinion, Justice White expressly rejected Walton's other contention that

"because [Arizona statute] § 13-703(E) provides that the court 'shall' impose the death penalty if one or more aggravating circumstances are found and mitigating circumstances are held insufficient to call for leniency, the statute creates an unconstitutional presumption that death is the proper sentence." 497 U.S. at 651.

As support for rejecting Walton's latter argument, Justice White looked to two capital cases decided by the Court only 4 months earlier:

"Our recent decisions in *Blystone v. Pennsylvania,* 494 U.S. 299 (1990) and *Boyde v. California,* 494 U.S. 370 (1990), foreclose this submission. . . . We pointed out [in *Blystone*] that '[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence.' " 497 U.S. at 651-52 (citing *Blystone,* 494 U.S. at 307).

Justice White then proceeded to explain why *Boyde v. California* in particular supported the plurality's analysis and its rejection of Walton's argument:

"Similarly, *Boyde v. California, supra,* upheld a pattern jury instruction which stated that '[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death.' See 494 U.S. at 374. . . . The Court specifically noted that 'there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and *States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." ' Id.,* at 377 (quoting *Franklin v. Lynaugh,* 487 U.S. 164 (1988) (plurality opinion)). Walton's arguments in this case are no more persuasive than those made in *Blystone* and *Boyde.*" (Emphasis added.) 497 U.S. at 652.

Justice Scalia joined White and the other three justices of this plurality, Chief Justice Rehnquist, Justice O'Connor, and Justice Kennedy, to form a majority which held Arizona's death penalty sentencing procedures were constitutional and affirmed Walton's death sentence which had been imposed under those procedures.

*Dissenting Opinion*

While Justice White did not use the word "equipoise" or expressly signal the concept, *i.e.,* specifically referencing "situations

where the mitigating and aggravating circumstances are in balance," his four dissenting colleagues certainly acknowledged that the issue of death at equipoise was directly presented to them. Justice Blackmun, writing for himself and fellow dissenters Justices Brennan, Marshall, and Stevens, not only addressed this specific issue in Section B of the dissenting opinion at 497 U.S. at 686, but actually began his analysis with death at equipoise:

*"I also believe that the Constitution forbids the State of Arizona to place upon the capital defendant the burden of proving mitigating circumstances that are 'sufficiently substantial to call for leniency.'* Ariz. Rev. Stat. Ann. § 13-703(E) (1989). Once an aggravating circumstance has been established, the Arizona statute mandates that death is to be deemed the appropriate penalty unless the defendant proves otherwise. That statutory provision, in my view, establishes a 'presumption of death' in violation of the Eighth Amendment. [Citing, *inter alia, Adamson v. Ricketts,* 865 F.2d 1011, 1041 (9th Cir. 1988).]

"The Arizona Supreme Court repeatedly has indicated that a defendant's mitigating evidence will be deemed 'sufficiently substantial to call for leniency' *only if the mitigating factors 'outweigh' those in aggravation.* . . . *If the mitigating and aggravating circumstances are in equipoise, the statute requires that the trial judge impose capital punishment.* The assertion that a sentence of death may be imposed *in such a case* runs directly counter to the Eighth Amendment requirement that a capital sentence must rest upon a 'determination that death is the appropriate punishment in a specific case.' [Citation omitted.]" (Emphasis added.) 497 U.S. at 686-87 (Blackmun, J., dissenting).

Not only did the four dissenters acknowledge that death at equipoise was directly presented to them, but more important, they also unequivocally interpreted Justice White's plurality opinion as having disposed of the issue. Specifically, the dissenters opined that the plurality's reliance on *Blystone v. Pennsylvania* and *Boyde v. California* was misplaced because those states' death penalty statutes were distinguishable from Arizona's on this very issue:

"The statutes upheld in those cases provided that the death penalty would be imposed 'only after a determination that the *aggravating circumstances outweigh the mitigating circumstances* present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances.' *Blystone,* 494 U.S. at 305. *In neither Boyde nor Blystone did the challenged statute require a capital sentence when aggravating and mitigating factors are evenly balanced.* Those decisions simply do not speak to the issue posed by the Arizona statute: whether the State permissibly may place upon the capital defendant the burden

of demonstrating that a sentence of death is *not* appropriate." (Emphasis added.) 497 U.S. at 687-88 (Blackmun, J., dissenting).

The dissenters' very next paragraph clearly continued their analysis of the issue of death at equipoise as follows:

"The plurality does not attempt to explain *why Arizona may require a capital sentence in a case where aggravating and mitigating circumstances are evenly balanced.* Indeed, the plurality does not even acknowledge that this is the dispositive question. Instead, it offers only a conclusory assertion: 'So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.' " 497 U.S. at 688 (Blackmun, J., dissenting).

The dissenters not only denounced the plurality's tacit approval of the concept that "in death, the tie goes to the State." They also worried that the plurality's lack of a "limiting principle" would allow states to place an even greater burden of proof upon the defendant fighting to avoid a sentence of death:

"One searches in vain for any hint of a limiting principle. May a State require that the death penalty be imposed whenever an aggravating factor is established and mitigating circumstances do not *'substantially* outweigh' those in aggravation? May a state statute provide that a death sentence is presumptively appropriate whenever an aggravating circumstance is proved, and that the presumption can be rebutted only by a showing that mitigating circumstances are *'extraordinarily great'*? These formulations would appear to satisfy the plurality's test; viz., that the State is required to establish an aggravating circumstance, and no mitigating evidence is excluded from the sentencer's consideration." (Emphasis added.) 497 U.S. at 688 (Blackmun, J., dissenting).

The dissenters also observed that the plurality's approval of this concept in the Arizona death penalty statute "appears to rest upon an analogy between mitigating evidence in capital sentencing and affirmative defenses in noncapital cases." 497 U.S. at 689. The dissenters then left no doubt that they believed the plurality incorrectly permitted the tie to go to the State. They ended their analysis by "conclud[ing] that the Constitution bars Arizona from placing upon a capital defendant the burden of proving that mitigating circumstances are 'sufficiently substantial to call for leniency' " — a phrase that the dissenters admitted was interpreted by

the Arizona Supreme Court as requiring the defendant to prove his mitigating factors outweighed his aggravating factors. 497 U.S. at 690.

In my view, the four dissenters were correct in their interpretation of their colleagues' plurality opinion. The plurality conceivably required a capital defendant to prove more than his or her mitigating factors "outweighed" his or her aggravating factors; rather, *e.g.*, that they "*substantially* outweighed" them. Today, however, we need not try to determine the outer reaches of the plurality opinion regarding the defendant's burden of proof; rather, we need only acknowledge that death at equipoise is within that opinion's constitutional boundaries.

### Controlling cases cited in Walton

That said, the part of the plurality opinion which most persuades me that death at equipoise is tacitly approved is—as observed by the dissent—Justice White's drawing an analogy between mitigating evidence and affirmative defenses. In particular, he cited two of the Supreme Court's capital decisions which placed the burden on the defendant to prove self-defense or insanity—or else be put to death: *Martin v. Ohio,* 480 U.S. 228, 94 L. Ed. 2d 267, 107 S. Ct. 1098 (1987); and *Leland v. Oregon,* 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002 (1952). He additionally cited two non-capital murder cases: *Patterson v. New York,* 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977); and *Rivera v. Delaware,* 429 U.S. 877, 50 L. Ed. 2d 160, 97 S. Ct. 226 (1976), which also placed the burden on the defendant to prove an affirmative defense. As Justice White concluded:

"*The basic principle of these cases controls the result in this case.* So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." (Emphasis added.) 497 U.S. at 650.

In one of the cited cases, *Leland v. Oregon,* 343 U.S. 790, the Court upheld a requirement that the defense of insanity be proved beyond a reasonable doubt by the defendant who had been sen-

tenced to death. Next, in *Rivera v. Delaware,* 429 U.S. 877, though the court dismissed the appeal for want of a substantial federal question, the case had precedential value: a defendant convicted of second-degree murder who raised an insanity defense was required to prove his mental illness or defect by a preponderance of the evidence.

One year after *Rivera,* the Court stated in the second-degree murder case of *Patterson v. New York,* 432 U.S. at 207, that it was "unwilling to reconsider *Leland* and *Rivera*" and upheld a requirement that the affirmative defense of extreme emotional disturbance be proved by a preponderance of the evidence.

Finally, in *Martin v. Ohio,* 480 U.S. at 236, the Court observed: "We have had the opportunity to depart from *Leland v. Oregon,* . . . but have refused to do so," citing *Rivera v. Delaware.* Additionally: "These cases were important to the *Patterson* decision and they, along with *Patterson,* are authority for our decision today." 480 U.S. at 236. Based upon these precedents, the *Martin* Court upheld the Ohio practice of imposing on a capital defendant the burden of proving by a preponderance of the evidence that he or she was acting in self-defense when he or she committed a murder.

It is additionally persuasive to me that two of these four murder cases cited by Justice White in the *Walton* plurality, *Patterson v. New York* and *Martin v. Ohio,* were also authored by him. Moreover, *Martin* not only affirmed the *Leland* line of cases, but it also was written only 3 years before White wrote the plurality opinion in *Walton.* (Of the other two cases cited as authority for *Martin's* holding, *Leland v. Oregon* predated all the members of the *Walton* Court, and *Rivera v. Delaware* had no author due to its dismissal on jurisdictional grounds.)

Accordingly, it is my opinion that Justice White knew exactly what these four cases stood for and therefore knew — perhaps better than his colleagues—exactly why these cases supported his opinion for the plurality in *Walton.* In short, since the Court had repeatedly approved requiring murder defendants, particularly two capital murder defendants, to prove their affirmative defenses by at least a preponderance of the evidence, it was entirely consistent

for the Court to require defendant Walton to prove, essentially by a preponderance of the evidence, why he should not be sentenced to death, *i.e.*, to "prov[e] mitigating circumstances sufficiently substantial to call for leniency." 497 U.S. at 650. Furthermore, the Court's reliance upon *Leland*, whose capital defendant was required to prove his affirmative defense by the even higher standard of beyond a reasonable doubt, clearly suggests the Court would approve some capital defendant sentencing burdens even greater than those placed upon petitioner Walton.

The majority in the instant case, however,—much like the majority in *Kleypas* whose reasoning it affirms in holding K.S.A. 21-4624(e) unconstitutional as written—does not make any attempt to address these four important United States Supreme Court precedents upon which Justice White expressly relied. This omission is curious, since White's heavy reliance upon these cases as the key to the *Walton* opinion's holding could not have been stated any more clearly: "The basic principle of these cases controls the result in this case." 497 U.S. at 650. At best, the majority obliquely dismisses these four essential cases as "cases that predate *Walton*" which require analyzing "distinct statutory language" and as a result, "obviously, do not control." According to *Walton*, however, they expressly control the outcome there and should in the instant case as well.

## CASE LAW INTERPRETATIONS OF WALTON

*Walton* clearly controls the issue of death at equipoise contained in the Kansas death penalty statute, K.S.A. 21-4624. Additionally persuasive, as Justice Davis points out in his dissent, are the interpretations of *Walton* by the two entities whose conflicting interpretations of the Arizona death penalty statute had to be resolved there: the Arizona Supreme Court and the Ninth Circuit Court of Appeals.

Since *Walton*, the Arizona Supreme Court has repeatedly interpreted its death penalty statute to require the defendant to prove mitigating factors which outweigh the aggravating factors in order to avoid a sentence of death. "On appeal, our task is independently to 'review the record to determine *whether any mitigating circum-*

*stances outweigh aggravating circumstances.'* " (Emphasis added.) *State v. Brewer,* 170 Ariz. 486, 504, 826 P.2d 783, *cert. denied* 506 U.S. 872 (1992). "We make this decision [on the death penalty sentence] after searching the entire record for error, examining the evidence establishing the presence or absence of aggravating and mitigating circumstances, and determining *whether the latter circumstances outweigh the former when both are present."* (Emphasis added.) *Brewer,* 170 Ariz. at 500. See *State v. Pandeli,* 200 Ariz. 365, 374, 26 P.3d 1136 (2001), *cert. granted and judgment rev'd by Ring v. Arizona,* 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002); *State v. Hoskins,* 199 Ariz. 127, 147, 14 P.3d 997 (2000), *cert. denied* 534 U.S. 970 (2001); *State v. Van Adams,* 194 Ariz. 408, 422, 984 P.2d 16 (1999), *cert. denied* 528 U.S. 1172 (2000); *State v. Djerf,* 191 Ariz. 583, 595, 959 P.2d 1274, *cert. denied* 525 U.S. 1024 (1998); *State v. Ysea,* 191 Ariz. 372, 375, 956 P.2d 499 (1998); *State v. Rienhardt,* 190 Ariz. 579, 592-93, 951 P.2d 454 (1997), *cert. denied* 525 U.S. 838 (1998); *State v. Thornton,* 187 Ariz. 325, 335, 929 P.2d 676 (1996), *cert. denied* 520 U.S. 1217 (1997); *State v. Gulbrandson,* 184 Ariz. 46, 72, 906 P.2d 579 (1995), *cert. denied* 518 U.S. 1022 (1996); *State v. Greenway,* 170 Ariz. 155, 170, 823 P.2d 22 (1991); *State v. Lavers,* 168 Ariz. 376, 391, 814 P.2d 333, *cert. denied* 502 U.S. 926 (1991).

Moreover, after *Walton,* Arizona has executed capital defendants under the authority of its interpretation of that statute, with 22 executions since 1992. Three of those executions occurred after the Arizona Supreme Court affirmed the defendants' death penalty sentences (post-*Walton*), and the United States Supreme Court denied their petitions for writs of certiorari. See *State v. Miller,* 186 Ariz. 314, 921 P.2d 1151 (1996), *cert. denied* 519 U.S. 1152 (1997); *State v. Ross,* 180 Ariz. 598, 886 P.2d 1354 (1994), *cert. denied* 516 U.S. 878 (1995); *State v. Brewer,* 170 Ariz. 486. One should be leery of reading too much into those denials, but one wonders: If the Supreme Court believed that Arizona was interpreting *Walton* in a way that violated a petitioner's constitutional rights, would not the Court have granted at least one petition to stop one of those three executions?

Additionally, the Arizona Supreme Court has interpreted *Walton* as rejecting the claim that its death penalty statute contained a presumption of death, an argument closely connected to the death at equipoise argument. In *Gulbrandson,* the defendant argued that the Arizona statute was unconstitutional because "once the state has proven at least one aggravating circumstance, the statute places the burden on a defendant to prove sufficiently substantial mitigation to outweigh *the presumption of death.*" (Emphasis added.) *Gulbrandson,* 184 Ariz. at 72. The Arizona Supreme Court responded: "This argument has been rejected," citing *Walton,* 497 U.S. at 650. *Gulbrandson,* 184 Ariz. at 72. See *State v. Salazar,* 173 Ariz. 399, 411, 844 P.2d 566 (1992), *cert. denied* 509 U.S. 912 (1993); *State v. Brewer,* 170 Ariz. at 497; *State v. Greenway,* 170 Ariz. at 160.

Most tellingly to me, the Ninth Circuit, which had declared the Arizona death penalty statute unconstitutional, and upon which the *Walton* dissent heavily relied to opine that the statute establishes a presumption of death in violation of the Eighth Amendment, also interpreted *Walton* as rejecting this argument. In *Richmond v. Lewis,* 948 F.2d 1473, 1481 (9th Cir. 1992), the defendant had argued "that the Arizona statute creates an unconstitutional presumption that death is the proper sentence." The Ninth Circuit responded: "The Supreme Court's recent decision in *Walton v. Arizona* specifically addressed and rejected" this contention. *Richmond,* 948 F.2d at 1481. See *Campbell v. Wood,* 18 F.3d 662, 675 (9th Cir.), *cert. denied* 511 U.S. 1119 (1994); *Adamson v. Lewis,* 955 F.2d 614, 619 (9th Cir. 1992), *cert. denied* 505 U.S. 1213 (1992); *Smith v. McCormick,* 914 F.2d 1153, 1170 (9th Cir. 1990).

Furthermore, I observe that the Kansas Supreme Court also apparently interpreted *Walton* in this fashion in *State v. Spain,* 269 Kan. 54, 4 P.3d 621 (2000)—just 1 year before *State v. Kleypas,* 272 Kan. 894, 40 P.3d 139 (2001)—when it stated:

"In *Walton,* five justices agreed the Arizona death penalty statute did not create an unconstitutional presumption in favor of the death penalty. The statute at issue in *Walton* required imposition of the sentence of death if any aggravating circumstances were established and there were ' "no mitigating circumstances sufficiently substantial" ' to warrant leniency. 497 U.S. at 644 (quoting Ariz. Rev. Stat. Ann.

§ 13-703[E] [1989]). Although the language chosen by the Arizona legislature does not include the terms 'weigh' or 'outweigh,' what the statute prescribes is a weighing process that results in imposition of the death penalty if the mitigating circumstances are not of sufficient weight *to tip the balance toward leniency.*" (Emphasis added.) 269 Kan. at 59.

I interpret our phrase "to tip the balance toward leniency" as requiring more mitigating circumstances than aggravating circumstances, *i.e.*, a tie goes to the State.

Finally, I observe, again with Justice Davis, that the Supreme Court of Idaho interpreted *Walton* the same way. In *State v. Hoffman,* 123 Idaho 638, 851 P.2d 934 (1993), *cert. denied* 511 U.S. 1012 (1994), the defendant argued that part of Idaho's death penalty statute, like Marsh argues about part of Kansas' statute, was "unconstitutional because it requires a defendant to provide mitigating circumstances which outweigh any statutory aggravating circumstance found." 123 Idaho at 646-47. The challenged portion of the statute, Idaho Code § 19-2515(c) (1987), is very similar to K.S.A. 21-4624(e). It stated:

"Where a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless the court finds at least one (1) statutory aggravating circumstance. *Where the court finds a statutory aggravating circumstance the court shall sentence the defendant to death unless the court finds that mitigating circumstances which may be presented outweigh the gravity of any aggravating circumstance found and make imposition of death unjust.*" (Emphasis added.)

Compare K.S.A. 21-4624(e):

"If, by unanimous vote, the jury finds beyond a reasonable doubt that *one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist, and further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death*; otherwise, the defendant shall be sentenced as provided by law." (Emphasis added.)

The Idaho Supreme Court quickly dispatched Mr. Hoffman's constitutional argument because

"[t]his scheme was found to be constitutional in *Walton v. Arizona,* 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). In that case, the Supreme Court held:

'So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case

to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency. 497 U.S. at 650, 110 S. Ct. at 3055.'

"Because the State was required to prove every element of the offense charged, including the statutory aggravating circumstances, the burden placed on Hoffman by operation of [Idaho Code] § 19-2515(c) did not violate his constitutional rights. *Walton v. Arizona, supra.*" 123 Idaho at 647.

For the same reasons, Marsh's argument—that K.S.A. 21-4624(e) is facially unconstitutional because it mandates death at equipoise—should be quickly dispatched by our court.

In summary, outside of the Colorado Supreme Court's decision in *People v. Young,* 814 P.2d 834 (Colo. 1991) (which I agree with Justice Davis misreads the Arizona sentencing scheme and relies upon the Colorado Constitution), and *Hulsey v. Sargent,* 868 F. Supp. 1090 (E.D. Ark. 1993) (which does not mention *Walton* but relies upon *Adamson,* which the Ninth Circuit admits was abrogated by *Walton*), I have been unable to find any other court since the *Walton* decision was released in 1990 that agrees with the position of the four justices in the majority in the instant case.

In conclusion, this court is bound by the United States Supreme Court's plurality holding in *Walton* until such time as that Court—as warned by Justice Scalia in his concurring opinion in that case—changes its mind. And *Walton* mandates that the death at equipoise concept contained in our death penalty statute, K.S.A. 21-4624, is constitutional.

McFARLAND, C.J., dissenting: I respectfully dissent. I agree with Justice Davis that the weighing equation contained in K.S.A. 21-4624(e) is constitutional as written. If we were writing on a clean slate, there would be no reason for me to further write in dissent; however, such is not the case. In *State v. Kleypas,* 272 Kan. 894, 40 P.3d 139 (2001), the majority opinion construed K.S.A. 21-4624(e) to be constitutional; I joined in the dissent of Justice Davis, as did Justice Abbott in a separate dissenting opinion, concluding the statute was constitutional as written. Thus, the *Kleypas* court unanimously upheld the constitutionality of K.S.A. 21-4624(e). Now, without any intervening change in substantive law, the ma-

jority opinion overrules *Kleypas,* not because the statute as construed is unconstitutional, but because the majority decides the *Kleypas* court exceeded its judicial authority in construing the statute. *Kleypas* was a 4 to 3 decision, consisting of a majority opinion and two written dissents. None of the three opinions took the position that the Kansas death penalty law must be struck down as constitutionally impermissible. The majority opinion upheld the law with an extremely minor judicial construction relative to equipoise, with the three dissenters upholding the law as written. In the case before us, another 4 to 3 decision, the majority concludes the death penalty is fatally flawed and rejects the majority's action in *Kleypas* which remedied the perceived equipoise flaw. There has been no change in relevant constitutional law as expressed by the United States Supreme Court. The only change has been the composition of the Kansas Supreme Court occasioned by the retirements of Justices Larson, Six, Lockett, and Abbott. While fidelity to the doctrine of stare decisis is not an "inexorable command," we should be highly skeptical of reversing an earlier decision where nothing has changed except the composition of the court. See *Payne v. Tennessee,* 501 U.S. 808, 848, 115 L. Ed. 2d 720, 111 S. Ct. 2597, *reh. denied* 501 U.S. 1277 (1991) (Marshall J., dissenting).

The importance of the doctrine of stare decisis to our legal system has been often stated. The United States Supreme Court has recognized that, although not an "inexorable command," "[s]tare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee,* 501 U.S. at 827. Stare decisis is:

"the means by which [the Court] ensure[s] that the law will not merely change erratically, but will develop in a principled and intelligible fashion. [Stare decisis] permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Vasquez v. Hillery,* 474 U.S. 254, 265-66, 88 L. Ed. 2d 598, 106 S. Ct. 617 (1986).

See also *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 854, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992) (stating that

the "very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable"); *Thornburgh v. American Coll. of Obst. & Gyn.*, 476 U.S. 747, 786-87, 90 L. Ed. 2d 779, 106 S. Ct. 2169 (1986) (White, J., dissenting) (stating that "[t]he rule of stare decisis is essential if case-by-case judicial decisionmaking is to be reconciled with the principle of the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results").

We have similarly acknowledged the importance of stare decisis in our decisions, stating:

"once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised. Stare decisis operates to promote system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by this court. . . . The application of stare decisis ensures stability and continuity—demonstrating a continuing legitimacy of judicial review." *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 356, 789 P.2d 541 (1990), *disapproved on other grounds, Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991).

The majority opinion pays lip service to the concept of stare decisis, but hastily disregards it, stating:

"Stare decisis is designed to protect well-settled and sound case law from precipitous or impulsive changes. It is not designed to insulate a questionable constitutional rule from thoughtful critique and, when called for, abandonment. This is especially true in a situation like the one facing us here. *Kleypas'* application of the avoidance doctrine was not fully vetted. It is young and previously untested. Its rewriting of K.S.A. 21-4624(e) was not only clearly erroneous; as a constitutional adjudication, it encroached upon the power of the legislature." 278 Kan. at 544-45.

The *Kleypas* appeal was heard in December 2000. In the preceding 6 months, an unprecedented number of hours was spent by many court research attorneys preparing the lengthiest research memorandum I have ever seen. Fifty-one issues relating to the validity of the conviction, sentence, and the constitutionality of the Kansas death penalty law as a whole were exhaustively considered by this court. At the end of a year of examination and deliberation,

on December 28, 2001, we issued a 338-page ruling in which we concluded that the Kansas death penalty law, and specifically the weighing equation contained in K.S.A. 21-4624(e), was constitutional. Far more time was spent on this case by the justices, in general, and on the weighing issue, in particular, than any other case since I became a member of this court in 1977. The majority opinion brushes off the majority holding in *Kleypas*; stating the issue was not "fully vetted," cannot withstand "thoughtful critique," and is "clearly erroneous."

While it is true that stare decisis need not be an "inexorable command," any departure from it should be "informed by a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case." See *Planned Parenthood v. Casey*, 505 U.S. at 854. These considerations include: (1) whether the decision sought to be overturned has proven to be intolerable simply in defying practical "workability"; (2) whether the decision is subject to a kind of reliance that would lend a special hardship to the consequences of overruling and add inequity to the cost of repudiation; (3) whether related principles of law have so far developed as to have left the rule established by the old decision no more than a remnant of abandoned doctrine; and (4) whether facts have so changed, or have come to be seen so differently, as to have robbed the rule established by the old decision of significant application or justification. 505 U.S. at 854-55.

There can be no serious contention that our decision in *Kleypas* construing K.S.A. 21-4624(e) in a constitutional manner has proven to be unworkable. From the beginning, the perceived constitutional problem with the weighing equation was slight: the weighing equation mandated death rather than a life sentence in the extremely unlikely event that the jury determined the aggravating and mitigating circumstances to be in perfect balance. It is almost impossible to conceive as to how this event would come about in a real, as opposed to hypothetical, situation. In construing the statute so as to mandate life in that circumstance, we avoided the possibility that the entire Kansas death penalty law would be ren-

dered invalid because of its application to an artificial situation that would almost certainly never arise. There is no real question that the statute, as construed by our decision in *Kleypas*, is constitutional.

This leads us to the question of whether our decision in *Kleypas* has been "subject to a kind of reliance that would lend a special hardship to the consequences of overruling and add inequity to the cost of repudiation." See *Casey*, 505 U.S. at 854. "The inquiry into reliance counts the cost of a rule's repudiation as it would fall on those who have relied reasonably on the rule's continued application." 505 U.S. at 855. From the majority opinion, one might think that there could have been no reliance on our decision in *Kleypas*, inasmuch as the majority characterizes it as "young and previously untested." 278 Kan. at 544. However, this ignores the very real reliance that the legislature, courts, and the people of Kansas have placed on our decision.

Whatever one's opinion on the moral validity of the death penalty, the fact remains that in 1994, the legislature, acting on behalf of the people of Kansas, passed into law an act providing for the death penalty as a possible punishment for a narrow, clearly defined group of intentional and premeditated murders. See L. 1994, ch. 252. *State v. Kleypas* was the first case to consider the validity of that death penalty, and our decision was eagerly awaited by the people of Kansas as a test of whether the death penalty that the legislature had enacted would pass constitutional muster.

Through our opinion in *Kleypas*, we told the legislature, and by extension the people of Kansas, that the death penalty law it had enacted was constitutional as construed by this court. The legislature had the right to rely on our construction of the weighing equation in K.S.A. 21-4624(e), and concluded that no further action on its part was necessary in order for Kansas to have a constitutional death penalty. In reliance on our assurances that the Kansas death penalty law was constitutional as construed, a substantial number of death penalty proceedings have been tried in this state, resulting in the imposition of five death sentences. A report by the Legislative Division of Post Audit estimated the taxpayers' costs of the post-*Kleypas* cases included in its study in the millions of dollars.

See Kansas Legislative Post Audit Committee Performance Audit Report, Costs Incurred for Death Penalty Cases, Appendix D (December 2003).

According to the majority, what this court should have done in *Kleypas* was declare the statute unconstitutional on its face. The majority therefore believes that is the appropriate remedy here. However, the situation is not the same here as it was in *Kleypas*. Where this court has not spoken on the constitutionality of a statute, all of those affected by it are on notice that its constitutionality has not been tested, and that it might be found wanting. However, where this court has addressed the precise statute involved, on the precise point articulated, and found the statute to be constitutional, persons should be entitled to rely on that decision, not see it overturned the very next time a case involving the same issue comes before this court. This reliance militates against haphazardly discarding our decision in *Kleypas*.

Certainly, there can be no argument that "related principles of law have so far developed as to have left the old rule" established in *Kleypas* "no more than a remnant of abandoned doctrine." See *Casey*, 505 U.S. at 855. Our decision in *Kleypas* is a mere 3 years old, and nothing this court has said in the interim has evidenced our intention to abandon its underlying principles. Similarly, there has been nothing in the jurisprudence of the United States Supreme Court during that time to show that our decision in *Kleypas* was incorrect.

Nor have "facts . . . so changed, or come to be seen so differently, as to have robbed the old rule [established by the *Kleypas* decision] of significant application or justification." See *Planned Parenthood v. Casey*, 505 U.S. at 855. There has been no significant change in the factual underpinnings of our *Kleypas* decision, and no change in facts that would cause its central holding to be rendered obsolete.

The majority's decision today, by the barest of margins, discards our 3-year-old decision in *Kleypas*, not because that decision has become unworkable, or the laws or facts underpinning it have changed, or a United States Supreme Court decision mandates it, but simply because this new majority has the power to do so. And

to what end? This is not a situation where the continuation of an allegedly erroneous decision has the potential to work great hardship on the rights of individuals. Our construction of the statute in *Kleypas* does not adversely affect the rights of those charged with capital murder; rather, it actually provides greater protection. There is no question that the weighing equation in K.S.A. 21-4624(e), as construed by our decision in *Kleypas*, is constitutional. Thus, there is now no possibility that any defendant will be sentenced to death where the aggravating and mitigating circumstances are in equipoise. This court's decision in *Kleypas* creates no prejudice to any defendant. Nevertheless, the majority's decision herein has the anomalous consequence that death-sentence defendants: Reginald D. Carr, Jonathan D. Carr, John Robinson, Sr., Douglas Belt, and Michael L. Marsh, II (defendant herein), will have their death sentences swept away, despite the fact that the equipoise factor which so concerns the majority was not present. The death penalty proceedings in each of these five cases, except *Marsh*, were tried post-*Kleypas* and, thus, each of the juries was instructed that, pursuant to our decision in *Kleypas*, the aggravating factors were required to outweigh the mitigating factors for death to be imposed, and each jury so found.

The majority reasons that our decision in *Kleypas* must be overruled in order to avoid encroaching upon the power of the legislature. One might assume that, had the legislature viewed our decision as an encroachment, there might have been an outcry at the time the decision was handed down. Yet, nothing of the sort occurred.

It is ironic that the majority, in its professed desire to avoid usurping the power of the legislature, does so by frustrating the legislature's clear intent to pass a constitutional death penalty. There is no indication that the legislature, in passing the Kansas death penalty law, was particularly concerned that the sentence be death in the event that the aggravating and mitigating circumstances were exactly equal. As Justice Davis has shown in his dissent, such an "equipoise" event is extremely unlikely to arise outside the realm of hypothetical situations that are more the province of law professors than judges. By invalidating the Kansas death

penalty law on the basis of its application to a technical event that is almost certain never to arise in the real world, the majority opinion thwarts the intention of the legislature, ostensibly, in order to pay tribute to it.

The only currency and legitimacy this court possesses is the confidence of the public that we will decide cases based on the consistent application of the law, rather than on the proclivities of individual court members. Attorneys, trial courts, and the public have the right to know that a point of law, once settled, will remain the settled law of the state and not be overturned every time the composition of the court changes. Our fidelity to the doctrine of stare decisis need not be absolute, but we should not abandon our prior decisions without a compelling reason to do so. See *United States v. International Business Machines Corp.*, 517 U.S. 843, 856, 135 L. Ed. 2d 124, 116 S. Ct. 1793 (1996). No compelling reason has been shown herein and, as a result, I believe the majority opinion is a breach of that fidelity.

I joined the dissent of Justice Davis in *Kleypas* because I concluded as he did that the weighing equation was constitutional as enacted. I still so believe and am joining his dissent herein on that issue. In *Kleypas*, in a 4 to 3 decision, all seven justices agreed the Kansas death penalty law was constitutional, either as construed in a very minor respect (majority) or as written (dissent). To now strike down the Kansas death penalty law is, in my opinion, wholly inappropriate and unjustified, and I dissent therefrom.